643 So.2d 1027 (1994)
Donald David DILLBECK, Appellant,
v.
STATE of Florida, Appellee.
No. 77752.
Supreme Court of Florida.
April 21, 1994.
Rehearings Denied August 18 and October 17, 1994.
Nancy A. Daniels, Public Defender, and David A. Davis, Asst. Public Defender, Second Judicial Circuit, Tallahassee, for appellant.
*1028 Robert A. Butterworth, Atty. Gen., and Carolyn M. Snurkowski, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Donald Dillbeck appeals his convictions for first-degree murder, armed robbery, and armed burglary, and sentences of death and two consecutive life terms. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm.
Dillbeck was sentenced to life imprisonment for killing a policeman with the officer's gun in 1979. While serving his sentence, he walked away from a public function he and other inmates were catering in Quincy, Florida. He walked to Tallahassee, bought a paring knife, and attempted to hijack a car and driver from a shopping mall parking lot on June 24, 1990. Faye Vann, who was seated in the car, resisted and Dillbeck stabbed her several times, killing her. Dillbeck attempted to flee in the car, crashed, and was arrested shortly thereafter and charged with first-degree murder, armed robbery, and armed burglary. He was convicted on all counts and sentenced to consecutive life terms on the robbery and burglary charges, and, consistent with the jury's eight-to-four recommendation, death on the murder charge. The court found five aggravating[1] and numerous mitigating[2] circumstances. Dillbeck raises ten issues on appeal.[3]
Dillbeck argues first that the trial court erred in refusing to excuse three prospective jurors for cause. We find he properly preserved this issue: He objected to the jurors, exhausted his peremptories in removing them, requested and received two additional peremptories, exhausted the two, asked for more, was denied, and then identified an additional juror he would have excused if possible. See Trotter v. State, 576 So.2d 691 (Fla. 1990). Our review of the record, however, shows that the trial court did not abuse its discretion in refusing to excuse the three. The voir dire transcript shows that each juror met the test of juror competency enunciated in Davis v. State, 461 So.2d 67, 70 (Fla. 1984), cert. denied, 473 U.S. 913, 105 S.Ct. 3540, 87 L.Ed.2d 663 (1985): "[T]he juror can lay aside any bias or prejudice and render his [or her] verdict solely upon the evidence presented and the instructions on the law given ... by the court." We find no error.
Dillbeck next claims that the trial court erred in refusing to allow him to present evidence in the guilt phase that he suffers from fetal alcohol effect caused by his mother's alcoholism during pregnancy. This condition, he contends, prevented him from forming the specific intent necessary to commit premeditated first-degree murder. The trial court admitted this evidence in the penalty phase and found in its sentencing order that "the existence of the condition known as fetal alcohol effect was established by the testimony."
Evidence concerning certain alcohol-related conditions has long been admissible during the guilt phase of criminal proceedings to show lack of specific intent. See Gurganus v. State, 451 So.2d 817, 822-23 (Fla. 1984) ("When specific intent is an element of the *1029 crime charged, evidence of voluntary intoxication ... is relevant."). This Court addressed the issue of the "diminished capacity" defense in Chestnut v. State, 538 So.2d 820 (Fla. 1989), and indicated that while evidence of most mental conditions is simply too misleading to be allowed in the guilt phase,[4]Gurganus evidence is permissible: "Gurganus simply reaffirmed the long-standing rule in Florida that evidence of voluntary intoxication is admissible in cases involving specific intent. Most states follow the same rule... ." Chestnut, 538 So.2d at 822 (citation omitted). We implied that other highly specific and commonly understood conditions may be excepted as well: "[C]onditions such as intoxication, medication, epilepsy, infancy, or senility are, in varying degrees, susceptible to quantification or objective demonstration, and to lay understanding." Id. at 823.
Three years after Chestnut was issued, this Court held in Bunney v. State, 603 So.2d 1270 (Fla. 1992), that the trial court erred in refusing to allow Bunney to raise epilepsy as a specific intent defense to first-degree murder. We affirmed the Gurganus exception to Chestnut for alcohol-related conditions and reasoned further that if evidence of a self-induced condition such as voluntary intoxication is admissible, then so too should be evidence of other commonly understood conditions that are beyond one's control, such as epilepsy:
Although this Court did not expressly rule in Chestnut that evidence of any particular condition is admissible, it is beyond dispute that evidence of voluntary intoxication or use of medication is admissible to show lack of specific intent. If evidence of these self-induced conditions is admissible, it stands to reason that evidence of certain commonly understood conditions that are beyond one's control, such as those noted in Chestnut (epilepsy, infancy, or senility), should also be admissible. In the present case, Bunney simply sought to show that he committed the crime during the course of a minor epileptic seizure. A jury is eminently qualified to consider this.
Bunney, 603 So.2d at 1273 (citation and footnote omitted).
The deleterious effect of alcohol on the human brain is both commonly recognized and well documented, and this undoubtedly underlies courts' willingness to allow evidence of alcohol-related conditions in the guilt phase of trials. As a practical matter, "[e]xposure to the effects of ... intoxicants upon state of mind is a part of common human experience which fact finders can understand and apply; indeed, they would apply them even if the state did not tell them they could." Wahrlich v. Arizona, 479 F.2d 1137, 1138 (9th Cir.), cert. denied, 414 U.S. 1011, 94 S.Ct. 375, 38 L.Ed.2d 249 (1973). Just as the harmful effect of alcohol on the mature brain of the adult imbiber is a matter within the common understanding, so too is the detrimental effect of this intoxicant on the delicate, evolving brain of a fetus held in utero.
As with "epilepsy, infancy, or senility," Bunney, 603 So.2d at 1273, we can envision few things more certainly beyond one's control than the drinking habits of a parent prior to one's birth. We perceive no significant legal distinction between the condition of epilepsy addressed in Bunney and that of alcohol-related brain damage in issue here  both are specific, commonly recognized conditions that are beyond one's control. In the present case, Dillbeck simply sought to show that his mother's intemperance during pregnancy damaged the fetus. "A jury is eminently qualified to consider this." Id. at 1273.
Although the trial court erred in refusing Dillbeck's bid to present fetal alcohol evidence during the guilt phase, we find the error harmless in light of the jury's written verdict finding both premeditated and felony murder. The fetal alcohol evidence proffered by Dillbeck consisted primarily of expert testimony attesting to his lack of impulse control, and was offered to show lack of premeditation. Dillbeck's own guilt-phase *1030 testimony, however, shows that hours before the tumultuous events surrounding the murder of Faye Vann, he plotted to leave the area by commandeering a car and driver to take him to Orlando to meet his former prison buddy.[5] The proffered evidence would have had minimal effect in defending against the deliberately planned and executed underlying felonies of armed robbery and burglary. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
Dillbeck claims as his third point that the trial court erred in requiring him to submit to an examination by the State's mental health expert prior to the penalty phase. In arguing before the trial court in favor of the exam, the State claimed it was seeking only to make the match equal, that without the exam the State was hog-tied in trying to rebut Dillbeck's experts, who had interviewed him. Dillbeck, on the other hand, claimed that requiring him to submit to the State's expert would constitute a violation of the Fifth Amendment's proscription against compelled self-incrimination.
This Court ruled in Nibert v. State, 574 So.2d 1059, 1062 (Fla. 1990), that "when a reasonable quantum of competent, uncontroverted evidence of a mitigating circumstance is presented, the trial court must find that the mitigating circumstance has been proved." In light of this requirement, we concluded two years later in Burns v. State, 609 So.2d 600 (Fla. 1992), that State experts are entitled to witness firsthand the trial testimony of defense experts. In Burns the trial court had denied the State's request to allow its expert to interview Burns but granted the State's request to allow its expert to remain in the courtroom while defense experts testified. We declined to address on appeal the propriety of the denial of the State's request to interview the defendant, but we found no error in allowing the State's expert to remain in the courtroom: "Under the circumstances, this was the only avenue available for the state to offer meaningful expert testimony to rebut the defense's evidence of mental mitigation. See Nibert v. State, 574 So.2d 1059, 1062 (Fla. 1990)." Burns, 609 So.2d at 606.
We recently addressed a similar issue in State v. Hickson, 630 So.2d 172 (Fla. 1993). There, Hickson, the defendant in a second-degree murder trial, sought to present expert evidence of the battered-spouse defense, relying on testimony of an expert who had interviewed her. She refused, however, to let the State's expert interview her. We concluded that such a lopsided practice is unfair:
If a defendant decides that she wants to rely on her expert's relating the battered-spouse syndrome to the facts of her case ... she waives her right to refuse to submit to an examination by the state's expert. A defendant who takes the stand waives the privilege against compelled self-incrimination. If a defendant were able to rely on her statements being presented to a trier of fact through an expert's testimony, she would, in effect, be able to testify without taking the stand and subjecting herself to the state's questions. Allowing the state's expert to examine a defendant will keep the state from being unduly prejudiced because a defendant will not be able to rely on expert testimony that the state has no effective means of rebutting.
Hickson, 630 So.2d at 176.
At the time of sentencing in the present case, Nibert had been decided, thus obligating the State to either rebut the defendant's mitigating evidence or run the risk of having the court accept that evidence as establishing one or more mitigating circumstances. We note that Dillbeck planned to, and ultimately did, present extensive mitigating evidence in the penalty phase through defense mental health experts who had interviewed him. Under these circumstances, we cannot say that the trial court abused its discretion in striving to level the playing field by ordering Dillbeck to submit to a prepenalty phase interview with the State's expert. See Burns. No truly objective tribunal can compel one side in a legal bout to abide by the Marquis of Queensberry's rules, while the other fights ungloved.
*1031 This Court implemented the following procedure in Hickson to be used in battered-spouse trials:
Therefore, if a defendant decides to use the battered-spouse syndrome to support a claim of self-defense, written notice to that effect must be communicated to the state similar to the procedure set out in Florida Rule of Criminal Procedure 3.216(c). When a defense expert [who has interviewed the defendant] will be used to demonstrate the presence of the syndrome, the state will then have the opportunity to have the defendant examined by its expert, who will be allowed to testify at trial to rebut a defense expert's testimony. This presents a defendant with the choice of either 1) having her expert testify directly about her case, in which instance the state may have her examined by its expert, or 2) both sides may present the testimony of experts who have not examined the defendant and who will not testify about the facts of her case.
Id. at 176 (footnote omitted). A comparable procedure would be helpful in capital trials. We adopt as a temporary measure the above procedure, as set out fully in Hickson, to govern the testimony of mental health experts in capital proceedings.
We have asked the Criminal Rules Committee of The Florida Bar to submit a proposed permanent rule addressing this issue. See Burns v. State, 609 So.2d 600, 606 n. 8 (Fla. 1992). Defense counsel in the present case has submitted a copy of an initial draft from the Bar which provides that where the defendant plans to use only in the penalty phase the testimony of an expert who has interviewed him or her, the State is entitled to examine the defendant only after conviction and after the State has certified that it will seek the death penalty. We find this provision sound and adopt it as an interim measure for use in capital cases. We find no error on this issue in the present case.
Dillbeck next claims that the trial court erred in finding as an aggravating circumstance that he committed the murder while effecting an escape from custody. He points out that he escaped from custody by walking away from a catering detail in Quincy, forty miles from Tallahassee, on June 22, 1990, a full two days prior to the murder. We note that "[w]hile an escape is technically completed upon an inmate's intentional act of leaving the established area of custody, the appellant in the present case was still in geographical proximity to the prison, had not abandoned his flight, and was attempting to secure transportation from the area. Those facts support a conclusion that the [present crime] was intended to facilitate the continuing escape... ." Ayendes v. State, 385 So.2d 698, 699 (Fla. 1st DCA 1980) (citation omitted). We find no error.[6]
Based on the foregoing, we affirm Dillbeck's convictions and sentences.
It is so ordered.
OVERTON, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.
McDONALD, J., concurs in part and dissents in part with an opinion.
BARKETT, C.J., did not participate in this case.
McDONALD, Judge, concurring in part, dissenting in part.
I concur with the affirmance of the guilt and sentence of Dillbeck. I disagree with the majority's conclusion that it was error to disallow in the guilt phase evidence of fetal alcohol syndrome. The quality of this evidence did not rise to the level required to be a defense to the claim of inability to form a specific intent. Chestnut v. State, 538 So.2d 820 (Fla. 1989), was properly followed by the trial judge. In any event it is clear that Dillbeck had the requisite intent to plan and commit a robbery and this homicide was completed during that robbery; first-degree murder was effected on a felony-murder basis.
NOTES
[1] The trial court found that Dillbeck was under sentence of imprisonment and had previously been convicted of another capital felony, and that the murder was committed during the course of a robbery and burglary, was committed to avoid arrest or effect escape, and was especially heinous, atrocious, or cruel. See § 921.141, Fla. Stat. (1989).
[2] The trial court found one statutory mitigating circumstance, i.e., that Dillbeck was substantially impaired, see § 921.141(6)(f), Fla. Stat. (1989), and numerous nonstatutory circumstances: abused childhood, fetal alcohol effect, mental illness, the mental illness is treatable, imprisonment at an early age in a violent prison, good-behavior, a loving family, and remorse. The court noted, however, that while several of these circumstances are present they are entitled to little weight here.
[3] Dillbeck claims that the trial court erred in addressing the following issues: 1) juror qualifications; 2) evidence of specific intent; 3) requiring Dillbeck to submit to a psychological exam by the State's expert; 4) flight instruction; 5) testimony of the State's mental health expert; 6) instruction on heinous, atrocious, or cruel; 7) the finding of heinous, atrocious, or cruel; 8) escape instruction; 9) proportionality; and 10) the allocating of the burden of proof in the penalty phase.
[4] The defendant in Chestnut v. State, 538 So.2d 820 (Fla. 1989), sought to introduce wide-ranging evidence of diminished mental capacity characterized by low intelligence, seizure disorder following head trauma, diminished cognitive functioning and verbal skills, passive and dependent personality, and exaggerated need for affection.
[5] Dillbeck himself had forgotten how to drive during his lengthy prison stay.
[6] We find the remainder of Dillbeck's claims to be without merit.