698 So.2d 1182 (1997)
Eddie Wayne DAVIS, Appellant,
v.
STATE of Florida, Appellee.
No. 86135.
Supreme Court of Florida.
June 5, 1997.
Rehearing Denied September 11, 1997.
*1185 James Marion Moorman, Public Defender and Robert F. Moeller, Assistant Public Defender, Tenth Judicial Circuit, Bartow, for Appellant.
*1186 Robert A. Butterworth, Attorney General and Candance M. Sabella, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Eddie Wayne Davis. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
On the afternoon of March 4, 1994, police found the body of eleven-year-old Kimberly Waters in a dumpster not far from her home. She had numerous bruises on her body, and the area between her vagina and anus had been lacerated. An autopsy revealed that the cause of death was strangulation.
On March 5, police questioned Davis, a former boyfriend of Kimberly's mother, at the new residence where he and his girlfriend were moving. Davis denied having any knowledge of the incident and said that he had been drinking at a nearby bar on the night of the murder. Later that same day police again located Davis at a job site and brought him to the police station for further questioning, where he repeated his alibi. Davis also agreed to and did provide a blood sample.
While Davis was being questioned at the station, police obtained a pair of blood-stained boots from the trailer Davis and his girlfriend had just vacated. Subsequent DNA tests revealed that the blood on the boots was consistent with the victim's blood and that Davis's DNA matched scrapings taken from the victim's fingernails. A warrant was issued for Davis's arrest.
On March 18, Davis agreed to go to the police station for more questioning. He was not told about the arrest warrant. At the station, he denied any involvement and repeated the alibi he had given earlier. After about fifteen minutes, police advised Davis of the DNA test results. Davis insisted they had the wrong person and asked if he was being arrested. Police told him that he was. At that point Davis requested to contact his mother so she could obtain an attorney for him, and the interview ceased. Davis was placed in a holding cell.
A few minutes later, while Davis was in the holding cell, Major Grady Judd approached him and, making eye contact, said that he was disappointed in Davis. When Davis responded inaudibly, Judd asked him to repeat what he had said. Davis made a comment suggesting that the victim's mother, Beverly Schultz, was involved. Judd explained that he could not discuss the case with Davis unless he reinitiated contact because Davis had requested an attorney. Davis said he wanted to talk, and he did so, confessing to the crimes against Kimberly and implicating Beverly Schultz as having solicited the crimes. Within a half hour after this interview, police conducted a taped interview in which Davis gave statements similar in substance to the untaped confession. Davis's full Miranda[1] warnings were not read to him until the taped confession began.
In May, 1994, Davis wrote a note asking to speak to detectives about the case. In response, police conducted a second taped interview on May 26, 1994. Police asked Davis if he was willing to proceed without the advice of his counsel, to which Davis responded yes, but specific Miranda warnings were not recited to Davis. During this interview, Davis again confessed to killing Kimberly but stated that Beverly Schultz was not involved. Davis explained that he originally went to Schultz's house to look for money to buy more beer. Because Schultz normally did not work on Thursday nights and because her car was gone, Davis believed that no one was home. Indeed, Schultz was not home at the time because she had agreed to work a double shift at the nursing rehabilitation center where she was employed. However, her daughters, Crystal and Kimberly, were at the house sleeping. When Davis turned on the lights in Beverly Schultz's bedroom, he saw Kimberly, who was sleeping in Schultz's bed. Kimberly woke up and saw him. He put his hand over her mouth and told her not to holler, telling her that he wanted to talk to her. Kimberly went with him into the living room. Davis put a rag in her mouth so she could not yell.
*1187 Davis related that they went outside and jumped a fence into the adjacent trailer park where Davis's old trailer was located. Davis said that while they were in the trailer, he tried to put his penis inside of Kimberly. When he did not succeed, he resorted to pushing two of his fingers into Kimberly's vagina. Afterwards, Davis took Kimberly to the nearby Moose Lodge. He struck her several times, then placed a piece of plastic over her mouth. She struggled and ripped the plastic with her fingers but Davis held it over her mouth and nose until she stopped moving. He put her in a dumpster and left.
Davis moved to suppress the March 18 and May 26 statements he made to law enforcement officers, arguing that his Miranda rights were violated. The trial court denied those motions. The jury found Davis guilty of first-degree murder, burglary with assault or battery, kidnapping a child under thirteen years of age, and sexual battery on a child under twelve years of age. The jury unanimously recommended a sentence of death and the trial court sentenced Davis to death.
In aggravation, the trial court found that the murder was: (1) committed by a person under sentence of imprisonment; (2) committed during the commission of a kidnapping and sexual battery; (3) committed for the purpose of avoiding or preventing a lawful arrest; and (4) especially heinous, atrocious, or cruel. As statutory mitigation, the court found that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance and gave this factor great weight.
As nonstatutory mitigation, the court found that Davis was capable of accepting responsibility for his actions and had shown remorse for his conduct and offered to plead guilty; that he had exhibited good behavior while in jail and prison; that he had demonstrated positive courtroom behavior; that he was capable of forming positive relationships with family members and others; that he had no history of violence in any of his past criminal activity; that he did not plan to kill or sexually assault the victim when he began his criminal conduct; that he cooperated with police, confessed his involvement in the crime, did not resist arrest, and did not try to flee or escape; that he had always confessed to crimes for which he had been arrested in the past, accepted responsibility, and pled guilty; that he had suffered from the effects of being placed in institutional settings at an early age and spending a significant portion of his life in such settings; and that Davis obtained his GED while in prison and participated in other self-improvement programs. Although the trial court gave "medium weight" to several of these nonstatutory mitigators, most of them were assigned little weight.
Davis raises ten issues in this appeal. As his first issue, Davis contends that the trial court erred in admitting the statements he made to law enforcement officers on March 18 and May 26. We address the statements made at each stage separately. First, with respect to the statements Davis made at the police station on March 18 before he was arrested, the trial court found that whether a Miranda violation had occurred was moot because Davis had not made any incriminating statements during that interview. However, Miranda prohibits the use of all statements made by an accused during custodial interrogation if the accused has not first been warned of the right against self-incrimination and the right to counsel.[2] *1188 Thus, statements obtained in violation of Miranda are inadmissible, regardless of whether they are inculpatory or exculpatory.
Nevertheless, we uphold the admissibility of Davis's prearrest statements on a different basis. Miranda warnings are required whenever the State seeks to introduce against a defendant statements made by the defendant while in custody and under interrogation. Absent one or the other, Miranda warnings are not required. Alston v. Redman, 34 F.3d 1237, 1243 (3d Cir.1994) (citing Miranda, 384 U.S. at 477-78, 86 S.Ct. at 1629-30); Sapp v. State, 690 So.2d 581 (Fla. 1997); see also Rhode Island v. Innis, 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) ("It is clear that the special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."). Although custody encompasses more than simply formal arrest, the sole fact that police had a warrant for Davis's arrest at the time he went to the station does not conclusively establish that he was in custody. Rather, there must exist a "restraint on freedom of movement of the degree associated with a formal arrest." Roman v. State, 475 So.2d 1228, 1231 (Fla.1985). The proper inquiry is not the unarticulated plan of the police, but rather how a reasonable person in the suspect's position would have perceived the situation. Id.
The circumstances of this case lead us to conclude that Davis was not in custody at the time he made the prearrest statements. Police had questioned Davis several times prior to March 18. At least once he had gone to the police station voluntarily for questioning and was permitted to leave. It is therefore unlikely that a reasonable person in Davis's position would have perceived that he was in custody until he was formally arrested. In any event, any error in admitting these prearrest statements was harmless. Davis did not say anything during the prearrest interview that he had not already said to police on previous occasions.
Next we address the admissibility of the untaped confession Davis made to Major Judd and Lieutenant Schreiber while in the holding cell. Davis points out that because he had invoked his right to counsel upon being arrested (and the trial court found that he had), police were prohibited under Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), from interrogating Davis unless he reinitiated contact. According to Davis, Judd's expression of his disappointment in Davis constituted initiation of contact by police in violation of Edwards. The trial court made a finding that Major Judd's statement did not constitute interrogation as defined in Innis and Arizona v. Mauro, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). We agree with the trial court's analysis and result. First, Judd's statement was not an express questioning of Davis. Second, Judd's statement was not the functional equivalent of express questioning because there was no allegation or showing in the record that the statement was reasonably likely to elicit an incriminating response from Davis based on his emotional or mental state. See Mauro, 481 U.S. at 526-27, 107 S.Ct. at 1935; Innis, 446 U.S. at 300-301, 100 S.Ct. at 1689-90. Moreover, although Judd eventually did ask Davis to repeat himself, thereby asking a question, it was not intended to elicit an incriminating response. For all Judd knew, Davis could have been asking for a drink of water; surely Judd was permitted to ascertain what Davis had said.
Alternatively, Davis argues that even if he reinitiated contact, Judd should have given him Miranda warnings before interviewing him in the holding cell, pursuant to Kight v. State, 512 So.2d 922 (Fla.1987); disapproved on other grounds, Owen v. State, 596 So.2d 985 (Fla.1992). In Kight, the Court held that a defendant who reinitiated contact with police after having invoked his Fifth Amendment right to counsel was entitled to a fresh set of Miranda warnings before being interrogated. Id. at 926. Yet, this Court later held in Christmas v. State, 632 So.2d 1368 (Fla.1994), that where the defendant who was in custody voluntarily *1189 initiated a conversation with law enforcement officers in which the defendant provided information about the case, Miranda warnings were not required.
Although in this case Major Judd did not read Davis his Miranda rights as they are usually set forth, the record shows that as soon as Judd understood that Davis was making statements about the murder, Judd explained to Davis that he would have to reinitiate contact with police because he had asked for a lawyer. Moreover, when Davis said that he could not afford an attorney, Judd assured him that the State would provide him with one. Therefore, it would be easy to conclude that a formal reading of the Miranda warnings was unnecessary. However, the requirement of giving Miranda warnings before custodial interrogation is a prophylactic rule intended to ensure that the uninformed or uneducated in our society know they are guaranteed the rights encompassed in the warnings. As far as we can tell, Davis had never been advised of his Miranda rights with respect to this case before talking to Judd. Under these circumstances, we are compelled to conclude that Davis's untaped confession to Judd should have been suppressed.
Notwithstanding, the erroneous admission of this confession was harmless beyond a reasonable doubt. Shortly after confessing in his holding cell, Davis gave a taped statement in which he voluntarily gave the same information contained in his prior statement to Judd. This statement was clearly admissible because Davis was fully informed of (and waived) his Miranda rights before the start of the taping session. See Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (holding that although defendant's voluntarily given initial statement was inadmissible because of Miranda violation, subsequent statement, made after careful Miranda warnings were given and waiver was obtained, was admissible).
As to the second taped confession, given on May 26, Davis was not given a fresh set of Miranda warnings, although he was reminded of his right to the advice of counsel. However, numerous state and federal courts have rejected the talismanic notion that a complete readvisement of Miranda warnings is necessary every time an accused undergoes additional custodial interrogation. See Brown v. State, 661 P.2d 1024 (Wyo. 1983), and cases cited therein. Rather than adhere to an overly mechanical application of Miranda, we believe that once Miranda has been complied with, the better test for admissibility of statements made in subsequent or successive custodial interrogations is whether the statements were given voluntarily. Such an inquiry must consider the totality of the circumstances. We recede from those portions of Kight and Christmas that may be inconsistent with this analysis.
In this case, Davis had previously received full Miranda warnings and he validly waived them. There is no evidence of coercion; in fact, Davis was responsible for initiating the contact that led to this second taped confession. He was once again apprised of his right to counsel. Under these circumstances, we conclude that the second taped confession was voluntary and that the underlying concerns of Miranda were fully satisfied. Thus, there was no error in admitting the second taped confession.
Davis's second issue is that the trial court erred in allowing the jury to hear a tape of the 911 emergency call Beverly Schultz made after discovering her daughter was missing. At trial the State proffered the tape for the stated purpose of showing Beverly Schultz's distressed state of mind at the time of the call. The State contended that Schultz's state of mind was relevant to rebut any inference that she might have been involved in the murder based on Davis's first taped confession, which implicated her. The State also argued that the tape was admissible as a spontaneous statement or an excited utterance. The trial court admitted the tape, instructing the jury that the tape was not being offered for the truth of the matters asserted in the tape, but only to establish Beverly Schultz's state of mind.
We find no error in the admission of the tape. In view of Davis's earlier confession implicating Schultz as the instigator of the crime, the tape was relevant to *1190 show her genuine concern over the loss of her child. In addition, the tape was admissible as an excited utterance under section 90.803(2), Florida Statutes (1993). Allison v. State, 661 So.2d 889 (Fla. 2d DCA 1995) (tape of 911 call by son upon finding mother dead admissible as excited utterance); Ware v. State, 596 So.2d 1200 (Fla. 3d DCA 1992) (tape of 911 call for help admissible as excited utterance). Moreover, the call was relevant to establish the circumstances of the crime and the time when Kimberly was discovered missing. Even if it could be said that the tape should not have been admitted, the error would be harmless beyond a reasonable doubt.
Third, Davis contends that the State improperly injected irrelevant matters and improper argument into the trial and exploited the emotional displays of its witnesses. Davis argues that it was error for the prosecutor (1) to ask a prospective juror during voir dire and in the presence of the other prospective jurors whether it would bother her that the case involved a child with a learning disability; (2) to refer to the victim's emotional handicap during closing argument where the victim's handicap had not been part of the State's case; (3) to refer to the emotional reaction of Detective Storie, who testified to discovering the victim's body; (4) to characterize statements given by Davis in one of his confessions as "bald-faced lies"; and (5) to refer to the crime and its perpetrator as "vicious" and "brutal."
As to asking a prospective juror in front of the others whether it would hinder her impartiality if the case involved a learning disabled child, we find no error. Whether a trial judge should have allowed interrogation of jurors on specific subjects is reviewed under an abuse of discretion standard. Farina v. State, 679 So.2d 1151, 1154 (Fla.1996). The prospective juror in question had worked with learning disabled children for ten years. The trial court did not abuse its discretion in permitting the prosecutor to voir dire this prospective juror and any of the other prospective jurors on this subject. The prosecutor stated that he intended to establish that Davis had targeted the victim because of her handicap. Ultimately he did not do so, but the trial judge was reasonable at that stage in permitting this question to determine if any of the jurors had strong feelings or biases that would prevent them from rendering an impartial verdict in the case. Moreover, the prosecutor did not dwell on the victim's handicap during voir dire, but rather asked the question and moved on to other areas.
The prosecutor's reference to the victim's emotional handicap in closing argument was not objected to by the defense. Thus the issue is waived. Even if it had been preserved, any error would have been harmless. The prosecutor made mention of the victim's handicap once in passing. If anything, the jury was more focused on the victim's young age than the fact that she may have been handicapped.
We find no error in the trial court's decision to overrule the defense's objection to the prosecutor's reference to Detective Storie as "the guy that got upset thinking about this little girl." The prosecutor was in the middle of making the argument that Davis placed the victim's body in the dumpster to avoid detection. In light of the number of law enforcement witnesses who testified, it is understandable that the prosecutor used this reference as a short-hand method of referring to the detective who discovered the victim's body in the dumpster. There was no undue emphasis on the detective's emotionalism.
Davis also argues that the prosecutor improperly referred to certain statements in Davis's taped confessions as "bald-faced lies," particularly where the State was responsible for admitting those tapes into evidence. We find that the comments did not cross the line into improper argument. When it is understood from the context of the argument that the charge is made with reference to the evidence, the prosecutor is merely submitting to the jury a conclusion that he or she is arguing can be drawn from the evidence. Craig v. State, 510 So.2d 857, 865 (Fla.1987). It was for the jury to decide what conclusion to draw from the evidence and the prosecutor was merely submitting his view of the evidence to them for consideration. *1191 Nor do we agree with the contention that the prosecutor's characterization of the crime and its perpetrator as "vicious" and "brutal" was improper argument in view of the evidence in the case.
In his fourth claim, Davis argues that the trial court erred in overruling defense objections to the standard jury instructions on reasonable doubt and premeditated murder. These issues have been resolved adversely to Davis by our prior case law. Esty v. State, 642 So.2d 1074 (Fla.1994) (reasonable doubt); Spencer v. State, 645 So.2d 377 (Fla.1994) (premeditation).

Penalty Phase
Davis asserts as his fifth issue that the trial court erred in permitting the State's mental health expert to examine Davis in order to rebut the defense's penalty phase mental health expert testimony. According to Davis, the compelled mental health examination violated his Fifth Amendment right against self-incrimination. In Dillbeck v. State, 643 So.2d 1027 (Fla.1994), we rejected the same argument. We reasoned that it would be unfair to permit a defendant to present mitigating mental health evidence at the penalty phase while denying the State the opportunity to present evidence on the same issue. This became especially so after our decision in Nibert v. State, 574 So.2d 1059 (Fla.1990), wherein we held that a trial court must find that a particular mitigating circumstance has been proved whenever the defendant has presented a "`reasonable quantum of competent, uncontroverted evidence' "of that mitigating circumstance. Dillbeck, 643 So.2d at 1030 (quoting Nibert, 574 So.2d at 1062). We also directed the proposal of a new Rule of Criminal Procedure that would permit the State to have its mental health expert examine a defendant who intends to present at the penalty phase the testimony of a mental health expert who has interviewed the defendant. We subsequently adopted such a rule. See Fla. R.Crim.P. 3.202. We therefore reject this argument.
Sixth, Davis argues that the jury recommendation of death was tainted by a number of trial errors. First, he claims that the trial court erred in permitting the prosecutor to cross-examine one of the defense's mental health experts about some hearsay contained in a predisposition report because it was not established that the expert had relied upon the report in rendering his opinion that Davis had been abused as a child. We disagree. The record shows that defense counsel questioned Dr. Dee on direct examination about the records he had reviewed. When Dr. Dee did not remember seeing any predisposition reports, defense counsel assured Dr. Dee that the predisposition reports were contained in the HRS records he had reviewed. On cross-examination, the prosecutor asked Dr. Dee to read a portion of the predisposition report which referred to an earlier HRS investigation. The report noted that the HRS investigation revealed no physical bruises on Davis and that an unnamed person stated that she had not seen bruises for five years. On redirect examination, defense counsel asked Dr. Dee about another of the predisposition reports, in which the author reported having seen belt marks on Davis in the past. It is clear the predisposition reports were among the records Dr. Dee relied upon in arriving at his opinion that Davis had been the victim of child abuse. We find no abuse of discretion in permitting the prosecutor to cross-examine the expert witness on material contained in the predisposition report. See Muehleman v. State, 503 So.2d 310, 315 (Fla.1987) (upholding admission into evidence of report constituting hearsay where expert witness considered report in formulating opinion).
Davis also challenges the State's introduction of a photopack photograph admitted during cross-examination of Davis's grandmother, depicting Davis with long hair and facial hair. We find no error. During its direct examination of Davis's grandmother, the defense admitted photographs of Davis as a young boy, thereby making Davis's appearance relevant. The photopack photograph was proper rebuttal to show that Davis no longer looked the same.
Further, Davis challenges the trial court's refusal to permit his attorney to testify. The situation arose when the State *1192 cross-examined the defense's mental health expert Dr. McClane about the fact that Davis's lawyers did not permit him to question Davis about the instant crimes and the effect this limitation had on the formulation of his opinions. Defense counsel objected to this questioning on the ground that the limitation imposed on their expert was a legal decision made in the wake of Dillbeck.
In Dillbeck, our ruling permitting the State to examine the defendant was limited to those situations where the defendant had been interviewed by the defense's mental health expert. Yet that is precisely what happened here. The fact that Davis's lawyers limited the subject matter of the questions that Dr. McClane could ask Davis does not change the fact that Davis was interviewed. The State was permitted to point out any weaknesses in Dr. McClane's testimony due to the restrictions placed on his interview of Davis. Nor was it error to deny defense counsel's request to personally testify in order to explain his strategy to the jury. Defense counsel was permitted on redirect to elicit that the witness's interview was limited in an attempt to insulate Davis from being examined by the State.
Davis also argues that the prosecutor improperly introduced the nonstatutory aggravator of future dangerousness into the penalty phase by stating to Dr. McClane during cross-examination that he couldn't predict "from this point forward" whether Davis would commit a crime such as the one he committed here. We agree that the trial court should have sustained defense counsel's objection. However, this error was harmless. The question was never answered because the court required the prosecutor to rephrase the question. Further, the court also told the jury that they would be instructed on the only aggravating circumstances which could be considered. See, e.g., Allen v. State, 662 So.2d 323, 331 (Fla.1995) (finding harmless error where the sentencing order specifically provided that the imposition of the death sentence was based solely on the statutory aggravating factors and the trial court did not allow any other aggravating factors to be argued to the jury), cert. denied, ___ U.S. ___, 116 S.Ct. 1326, 134 L.Ed.2d 477 (1996).
We reject Davis's contention that the prosecutor improperly misled the jurors into believing that they should not be swayed by any sympathy they felt for Davis. See Valle v. State, 581 So.2d 40, 46-47 (Fla.1991). Likewise, we find no merit in the argument that the prosecutor improperly told the jury that the under sentence of imprisonment aggravator alone was sufficient for imposing the death penalty.
As his seventh point, Davis argues that the trial court erred in denying his proposed jury instructions on nonstatutory mitigating factors. We have repeatedly ruled that the standard jury instructions are sufficient. The trial court acted within its discretion to deny a special instruction. E.g., Kilgore v. State, 688 So.2d 895 (Fla.1996); Ferrell v. State, 653 So.2d 367, 370 (Fla. 1995), cert. denied, ___ U.S. ___, 117 S.Ct. 1262, 137 L.Ed.2d 341 (1997); Gamble v. State, 659 So.2d 242, 246 (Fla.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 933, 133 L.Ed.2d 860 (1996). For the same reason, we reject Davis's argument that the trial court should have given an instruction that unanimous agreement was not required for the consideration of mitigating factors.
Eighth, Davis attacks both the jury instruction on the avoid arrest aggravator and the sufficiency of the evidence in support thereof. The trial court gave the following instruction for this aggravator: "The crime for which the defendant is to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest, or effecting an escape from custody." Davis argues that because the victim in this case was not a law enforcement officer, the jury should have been instructed that they could find this aggravator only if the State had proven beyond a reasonable doubt that the dominant or only motive for the killing was elimination of the witness. In support of this argument, he cites to our decisions holding that in order for this aggravator to be established where the victim is not a law enforcement officer, the State must clearly show that the dominant or only motive for the killing was witness elimination. E.g., Robertson *1193 v. State, 611 So.2d 1228, 1232 (Fla.1993); Jackson v. State, 599 So.2d 103, 109 (Fla. 1992); Jackson v. State, 575 So.2d 181, 190 (Fla.1991). However, not every court construction of an aggravating factor must be incorporated into a jury instruction defining that aggravator. See Jackson v. State, 648 So.2d 85, 90 (Fla.1994) (qualifying that not every aggravating factor necessarily requires instruction that incorporates judicial interpretation of that factor). In Whitton v. State, 649 So.2d 861, 867 n. 10 (Fla.1994), cert. denied, ___ U.S. ___, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995), we stated that, unlike the heinous, atrocious, or cruel statutory aggravator, the avoid arrest statutory aggravator did not contain terms so vague as to leave the jury without sufficient guidance for determining the absence or presence of the factor. The challenged instruction was therefore legally adequate.
Nor do we agree with the claim that there was insufficient evidence to establish the avoid arrest aggravator. Davis likens the circumstances of this case to those in Doyle v. State, 460 So.2d 353 (Fla.1984), where the Court struck down the avoid arrest aggravator. However, Davis stated in his confession that when Kimberly Waters awoke to find Davis in the bedroom, he placed a rag in her mouth to keep her quiet. He transported her to his trailer in a nearby trailer park where he sexually abused her. Davis admitted that he didn't want anybody to know that he had done something like that. He killed her by striking her with his fist and holding a piece of plastic over her mouth. He also admitted that he put her in the dumpster to enable him to get away before her body could be found. These circumstances more closely resemble cases in which we have upheld this aggravator. See Swafford v. State, 533 So.2d 270, 276 (Fla. 1988); Cave v. State, 476 So.2d 180, 188 (Fla.1985); Routly v. State, 440 So.2d 1257, 1264 (Fla.1983).
As his ninth issue, Davis contends that the trial court erred in finding that his control release status supported the finding that he was under a sentence of imprisonment at the time of the murder.[3] We have not ruled on this precise issue before. In Straight v. State, 397 So.2d 903 (Fla.1981), this Court held that evidence that the defendant was on parole at the time of the murder supported a finding that the defendant was under a sentence of imprisonment for purposes of this aggravator. Later, in Haliburton v. State, 561 So.2d 248, 252 (Fla.1990), we found that this aggravator also included situations where the defendant had been out on mandatory conditional release.[4] We based our reasoning on language in the mandatory conditional release statute stating that a person under mandatory conditional release was subject to all statutes relating to parole. On the other hand, in Bolender v. State, 422 So.2d 833 (Fla.1982), this Court held that probation did not qualify for the under sentence of imprisonment aggravator because the defendant was not incarcerated. In Trotter v. State, 576 So.2d 691, 694 (Fla. 1990), we applied the same reasoning to hold that community control did not satisfy this aggravator.[5]
Davis posits that control release is similar to community control and therefore does not qualify as a "sentence of imprisonment" under the reasoning of Trotter. He distinguishes control release from parole by pointing out that only inmates who are ineligible for parole may qualify for control release. He further distinguishes the two by pointing out that, unlike parole violators, those who have their control release revoked are not entitled to credit for time spent out of prison. However, both of these arguments tend to suggest that control release is even more restrictive than parole.
We find that Haliburton governs this issue because control release is most like parole. Like parole, control release is provided for under chapter 947, Florida Statutes (1993). That chapter creates the Parole Commission and sets forth its powers and duties, including *1194 administration of both the parole and control release programs. In contrast, probation and community control are housed under a separate chapter[6] and fall under court supervision. The similarities between parole and control release are greater than their differences. We therefore hold that a defendant under control release at the time he or she committed the murder was under a sentence of imprisonment for purposes of section 921.141(5)(a).
Finally, Davis attacks the heinous, atrocious, or cruel (HAC) aggravator and the adequacy of the instruction given to the jury. The instruction given in this case was identical to the one given in Hall v. State, 614 So.2d 473, 478 (Fla.1993). We found that the instruction "define[d] the terms sufficiently to save both the instruction and the aggravator from vagueness challenges." Id. (emphasis added.) We see no reason to recede from Hall.
The sentence of death in this case is proportional to other sentences we have approved.
The judgment of guilt and the sentence of death are hereby affirmed. The judgments and sentences for burglary, kidnapping, and sexual battery are also affirmed.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING and WELLS, JJ., concur.
ANSTEAD, J., concurs in result only as to conviction and concurs as to sentence.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] In Miranda, the Court said:

The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant. No distinction can be drawn between statements which are direct confessions and statements which amount to "admissions" of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely "exculpatory." If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement.
384 U.S. at 476-77.
[3] § 921.141(5)(a), Fla.Stat. (1993).
[4] § 944.291, Fla.Stat. (1979).
[5] The statute was subsequently amended to expressly include community control as an aggravating circumstance. Ch. 91-271, § 1, at 2562, Laws of Fla.
[6] Chapter 948, Fla.Stat. (1993).