GROSS, J.
Fresnel Atilus was shot and killed while operating his ice cream truck in Lake Park, Florida. At trial, the State’s theory of the case was that appellant, Michael Murdock, was guilty of first-degree murder and attempted robbery with a firearm as a principal.[1] A jury found Murdock guilty as charged. We reverse because the police misinformed Murdock about his Fifth Amendment rights and failed to correct the misinformation before Murdock gave an incriminating statement.
There were no eyewitnesses to the actual shooting, but two witnesses saw men flee from the scene of the crime. The victim’s cousin saw two men run away from the ice cream truck after hearing shots fired; he then watched as they jumped into a parked car and drove away. Another resident who lived in an apartment overlooking the parked ice cream truck came outside after hearing shots fired, at which point she saw one man run away from the truck.
*1052 The deputy sheriff who first responded to the crime scene testified that the ice cream truck was “fortified” with locked doors and metal screens covering the windows. The deputy had to break a window and unlock a door to enter the truck. The crime scene investigator collected DNA and fingerprint evidence from the crime scene, but her testing did not link Mur-dock to the offense.
The primary evidence against Murdock came from his statements to the police. At the station house, a detective conducted two interviews with Murdock separated by a 20-minute break.
The first interview began at approximately 1:48 a.m. Before the detective read him his Miranda[2] rights at the beginning of the interview, Murdock said he did not want to talk to the detective. The detective ignored the invocation, silenced Murdock, and continued the interrogation:
[Murdock]: ... But I just want to go home, man. I don’t wanna ... I don’t wanna talk to nobody until I know what’s going on.
[Detective]: So, you volunteered to come up here. Ok, let me lay it out for you-
[Murdock]: Yeah ... I want to know my situation — I wanna know the witness ... I wanna know-
[Detective]: Listen, I’m gonna be very frank with you.
[Murdock]: I want to say ... ya’ll won’t listen to my side. I know ya’ll got a job to do-
[Detective]: Listen, I can’t talk to you right now, okay? I want to talk to you but it’s hard for me to talk to you when you’re talking] over me.
[[Image here]]
You understand I want to hear everything you have to say. I’m not gonna ask you any questions. Okay. Here’s where you sit. You were driving the vehicle in which somebody entered the vehicle after a homicide, after they lit up a guy. They got into your vehicle and fled the scene. Okay? I’m not asking you questions, I’m telling you.
[[Image here]]
Okay? Right now, depending on what you tell me, determines your situation. And what I’m gonna do right now is I’m gonna read you your rights.
(Emphasis added).
Around 1:57 a.m., the detective read Murdock his Miranda rights. Mur-dock paused to inquire into his right to counsel:
[Murdock]: Yes, sir. Can you go back to that thing about the lawyer? I just said, yes, sir.
[Detective]: Okay. Which one?
[Murdock]: You said I ... uh ... you got [to] appoint me a lawyer?
[Detective]: Okay.
[Murdock]: Or something like that.
[Detective]: If you cannot afford a lawyer, you’re entitled to the presence and representation of court appointed lawyer before you make any statement and during any questioning.
[Murdock]: So I can talk to a lawyer before I talk to ya’ll?
[Detective]: Well, that means after you’re charged ... (talk over) ...
[Murdock]: Oh. Oh.
[Detective]: ... you’ll be given a Public Defender.
[Murdock]: See, that’s what I’m saying ... (talkover) ...
*1053 [Detective]: Okay? You’re not charged. Relax. I told you you’re not under arrest ... (talkover) ...
[Murdock]: Yeah. Yeah, I ain’t.
(Emphasis added). The detective thus misinformed Murdock that he could consult with an attorney only after he was charged.
By 2:30 a.m., Murdock became hysterical. He offered to implicate others in the crime if the detective would let him go home:
[Murdock]: God, God help me man! I didn’t do nothing, man! [Gets onto his knees, facing the wall and leaning his upper body onto the seat of the chair he has been sitting i[n] (praying) ].
[Detective returns to the room at 2:31 a.m.]
[Detective]: Are you praying? Have some water. It’s gonna be OK. I have one question for you: are you gonna help us find these two guys?
[[Image here]]
[Murdock]: Are ya’ll gonna release me?
[Detective]: Write it down. Cause the next words out of my mouth are gonna hurt you.
[Murdock]: Ya’ll are gonna release me? If I help ya’ll, are you gonna release me?
[Detective]: Hmm-mmm, No.
[[Image here]]
[Murdock]: So what am I going to jail for?
[Detective]: First degree murder. Now it’s up to you how you want to play your cards. Do you want to show yourself as a person who is sorry for what he’s done — which you’re much doing because you’re crying. I don’t know if it’s for yourself or for this guy and his 5 or 6 kids.
Soon thereafter, Murdock asked to stop the interview. The detective, however, leaned on Murdock for more information:
[Murdock]: Alright, can I talk to you tomorrow ?
[Detective]: I’m gonna give you my business card, if you want to contact me tomorrow, you can contact me ... But, you’re going to be given a public defender in the morning.
[Murdock]: Why?
[Detective]: Because we’re going to book you.
[Murdock]: But, I just need time to ...
[Detective]: We all need time buddy. The time you need is the next five minutes before we leave here and go back up to Lake Park. This is your magic five minutes, buddy. Either cooperate ... and show that you’re trying to help and that you didn’t mean for this to happen cause you were supposed to be just the getaway driver ... or you swallow all that information you have—
[Murdock]: But you said, when you read me my rights, I don’t have to talk right now. You said I could talk later.
[Detective]: That’s one of your rights. I explained that to you.
[Murdock]: And I said, ‘Can I talk to you later?’ Did I not sir? And you said, “Yeah, you can talk later.’
[Detective]: When was that?
[Murdock]: Earlier.
[[Image here]]
[Murdock]: It don’t have to be today or nothing?
[Detective]: Ok, but you agreed to talk to me today.
[[Image here]]
*1054 [Murdock]: This stuff is over-whelming me ... my thoughts ... my head is not-
[Detective]: You don’t have to have thoughts right now ... you have to spit those two names out.
(Emphasis added).
Before concluding the interview, the detective emphasized to Murdock that the clock was ticking on his chance to “help himself’ in the case:
[Detective]: Sit down! Do you want to talk to me anymore?
[Murdock]: I’d rather talk to you tomorrow.
[Detective]: Ok. Well, ok, good luck with that. I have a feeling that goodbye tonight [will] be the last time that we talk about this case.
After the end of the first interview, Murdock was placed in a holding cell. Approximately 20 minutes later, Murdock asked to speak with the detective again. At 3 a.m., the detective conducted a second interview.
At the beginning of the second interview, the detective attempted to reread Murdock his Miranda rights, however, Murdock told the detective to forego the recitation, indicating that he would rely on his understanding of his rights from the previous interview.[3] The detective declined the offer and reread Murdock his rights. One by one, Murdock stated that he understood each right.
In the second interview, Murdock incriminated himself, stating the following:
• Frank Collins and “Chopper” had called Murdock for a ride.
• Collins told Murdock they were “fixin’ to try and lick the ice cream truck.”
• Murdock thought Collins and Chopper wanted to rob the ice cream truck.
• Murdock picked up Collins and Chopper and drove them to the truck. He then waited for them in his car in a nearby alleyway.
• After hearing shots fired, Murdock saw Collins return with a gun in his hand.
• Murdock then dropped the men off at another location.
The trial court suppressed the first interview because the detective “gave an incorrect response” when Murdock inquired into his right to counsel. However, the trial court denied Murdock’s motion to suppress the second interview. After struggling with this “close question,” the trial court ruled that the State had overcome the defect from the first interview because the detective gave Murdock an uninterrupted rereading of his Miranda rights and Murdock indicated that he understood each right.
A jury convicted Murdock of first-degree murder and attempted robbery with a firearm. He was sentenced to concurrent terms of life and 15 years in prison.
This Court reviews a motion to suppress under a mixed standard of review. Peraza v. State, 69 So.3d 338, 340 (Fla. 4th DCA 2011). We are “bound by the trial court’s findings of historical fact if those findings are supported by competent, substantial evidence.” Rozzo v. State, 75 So.3d 409, 412 (Fla. 4th DCA 2011) (citing Pagan v. State, 830 So.2d 792, 806 (Fla.2002)); Hunter v. State, 32 So.3d 170, 173 (Fla. 4th DCA 2010). However, we “appl[y] a de novo standard of review to the mixed questions of law and fact that ultimately determine constitutional issues.” Ferguson v. State, 58 So.3d 360, 363 (Fla. 4th DCA 2011).
*1055 “Both the United States and Florida Constitutions provide that persons shall not be ‘compelled’ to be witnesses against themselves in any criminal matter.” Ross v. State, 45 So.3d 403, 412 (Fla.2010) (citing U.S. Const. amend. V; art. I, § 9, Fla. Const.). “To give effect to the Fifth Amendment right against self-incrimination, an accused person has the right to have counsel present during a custodial interrogation, and police must clearly advise the accused of that right.” Moss v. State, 60 So.3d 540, 542 (Fla. 4th DCA 2011) (citing Miranda, 384 U.S. at 467-72, 86 S.Ct. 1602).
Further, “if, at any point during custodial interrogation, a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer.” State v. Glatzmayer, 789 So.2d 297, 303 (Fla.2001) (quoting Almeida v. State, 737 So.2d 520, 525 (Fla.1999)). The proscription against interrogating an accused who invokes the right to counsel “necessarily embraces a scenario ... [where] the defendant ... seek[s] basic information on which to make an informed decision concerning his right to counsel.” Almeida, 737 So.2d at 525 (discussing Traylor v. State, 596 So.2d 957, 966 (Fla.1992)).
A defendant may waive his Miranda rights, provided that the defendant does so “voluntarily, knowingly and intelligently.” Joe v. State, 66 So.3d 423, 425 (Fla. 4th DCA 2011) (quoting Miranda, 384 U.S. at 444, 86 S.Ct. 1602). A determination of “a knowing and intelligent waiver of Miranda rights requires an examination of the totality of the circumstances.” Jennings v. State, 718 So.2d 144, 149 (Fla.1998). Police deception alone does not render a confession involuntary. Wyche v. State, 987 So.2d 23, 28 (Fla.2008); Fitzpatrick v. State, 900 So.2d 495, 511 (Fla.2005); see also Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (holding confession was voluntary despite police misrepresentation where the questioning was brief, and the defendant “was a mature individual of normal intelligence”). Rather, the misrepresentation must be “substantial [enough] ... to automatically render [the] confession involuntary.” Nelson v. State, 850 So.2d 514, 522 (Fla.2003).
The voluntariness of a waiver entails a two-part inquiry:
The first is whether the waiver was a free choice on the part of the defendant and not the product of intimidation, coercion, or deception. The second is whether the waiver was made with a full awareness of the nature of the right being abandoned and the consequences of the abandonment.
Louis v. State, 855 So.2d 253, 255 (Fla. 4th DCA 2003) (citing Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)) (emphasis added); see also Schneckloth v. Bustamonte, 412 U.S. 218, 225-26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (discussing “the test of voluntariness”).
“The police may not use misinformation about Miranda rights to nudge a hesitant suspect into initially waiving those rights and speaking with the police.” Dooley v. State, 743 So.2d 65, 69 (Fla. 4th DCA 1999), approved of in Cuervo v. State, 967 So.2d 155, 165-66 (Fla.2007) (finding the prophylactic effect of Miranda to be rendered a nullity where police seek statements in a manner that misleads the accused’s understanding of his or her rights); see also Cribbs v. State, 378 So.2d 316, 318 (Fla. 1st DCA 1980) (suppressing statement where interrogating officer made “misleading and confusing” statement that accused was not entitled to counsel until *1056 the court appointed counsel or the state brought charges).
In this case, the police obtained Murdock’s statement in violation of Miranda. During the first interview, the detective gave Murdock bad information about when he had the right to consult with a lawyer. Murdock relied on the detective’s misrepresentation before the second interview, indicating that he remembered his rights from the previous interview and offering to stipulate to understanding them. During the second reading of the Miranda rights, the detective did nothing to correct the earlier misinformation. The detective skillfully used interrogation techniques to pressure Mur-dock and induce him to talk to the police before consulting with a lawyer. By telling Murdock that he was not entitled to an attorney until after he was charged, and by insinuating that by talking to him Mur-dock could help himself, the detective overcame Murdock’s reluctance to speak. Murdock did not have a full awareness of the rights he was abandoning, such that his waiver of them was not voluntary, knowing, and intelligent.
To allow the State to use the second interview at Murdock’s trial would undermine the purposes of the Miranda warning as identified by the United States and Florida Supreme Courts. The United States Supreme Court has explained that the reason for a Miranda warning is to give a criminal defendant adequate and effective knowledge of his or her constitutional right against self-incrimination. See Missouri v. Seibert, 542 U.S. 600, 609-14, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion). The purpose of Miranda warnings is to prevent government officials from using “the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment,” Arizona v. Mauro, 481 U.S. 520, 529-30, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987), and to prevent “repeated rounds of questioning to undermine the will of the person being questioned.” Henry v. State, 574 So.2d 66, 70 (Fla.1991) (citing Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)).
Here, the misinformation, the coercive nature of confinement, and the repeated rounds of questioning combined to “coax an unwilling suspect to speak to police.” Id. at 70 (involving a situation where there was “no effort” to coax an unwilling subject); see also Davis v. State, 698 So.2d 1182, 1189 (Fla.1997) (stating that the purpose for reading Miranda warnings is “to ensure that the uninformed or uneducated in our society know they are guaranteed the rights encompassed in the warnings”).
This case most resembles Dooley and Cuervo, cases where the police misled suspects about their Miranda rights.
In Dooley, the defendant stated, “I don’t wish to waive my rights.” 743 So.2d at 67. The detective responded, “By waiving your rights now doesn’t mean that you waive them in the future. All you’re saying here now is that you’re talking to me without the presence of an attorney. If one is required later on, if that’s your wish, one can be appointed to you. Do you understand that?” Id. The defendant agreed to talk and made an incriminating statement. Id. Since the detective’s misrepresentation “indicated that the defendant could speak with the officer without risk,” this court suppressed the statement, finding it “was in direct response to further interrogation and misinformation that was constitutionally impermissible.” Id. at 69.
Similar to this case, Cuervo involved the use of time pressure to compel a statement; there, the Florida Supreme Court suppressed a confession where officers persisted in asking the defendant whether *1057 he wished to talk after the defendant had invoked his right to remain silent. 967 So.2d at 164-65. The defendant stated that he understood his rights and did not want to speak. Id. at 157. Nevertheless, the interrogating officers informed the defendant that he had a brief window to vindicate himself. Id. at 157-58. The Florida Supreme Court found that by advising the defendant “that ‘now5 was his time to tell his side of the story, this exchange may have confused Cuervo about the meaning of his Miranda rights, specifically the right to appointed counsel before questioning.” Id. at 165 (emphasis supplied). The Florida Supreme Court held that the officers had unlawfully engaged in conduct “reasonably designed to elicit a waiver of those rights and an incriminating response.” Id.
The State argues that Murdock overcame his misunderstanding because there was a break in time in between the two interviews and the detective rereading him his Miranda warnings. The break in time and the rereading of the Miranda warnings did nothing to address Murdock’s faulty understanding of his rights generated by the detective’s initial misinformation. Simply rereading the rights, without correcting the earlier explanation, prevented Murdock from attaining a “full awareness of the nature of the right being abandoned and the consequences of the abandonment.” Louis, 855 So.2d at 255. “The inquiry in this case turns on the [defendant’s] state of mind, not the investigator’s, and the potential effect on [defendant] of the words used....’ ” Jackson v. State, 832 So.2d 932, 934 (Fla. 3d DCA 2002) (quoting D.N. v. State, 529 So.2d 1217, 1223 (Fla. 1st DCA 1988), disapproved of on other grounds by State v. G.C., 572 So.2d 1380 (Fla.1991) (alterations in original)).
Therefore, we reverse to suppress the second interview and remand for a new trial.
WARNER and LEVINE, JJ., concur.

. Section 777.011, Florida Statutes (2010), provides,
Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Murdock asked, "[C]an I just like say I understand all that stuff because I was....”