Eddie Lavell PARKER *v.* STATE of Arkansas

CR 97-1195                                        968 S.W.2d 592

Supreme Court of Arkansas
Opinion delivered May 7, 1998

*Mike Everett,* for appellant.

*Winston Bryant,* Att'y Gen., by: *Mac Golden,* Asst. Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant Eddie Lavell Parker appeals the judgment of the Craighead County Circuit Court convicting him of one count of capital murder and one count of first-degree murder and sentencing him to life imprisonment without parole. This court has jurisdiction pursuant to Ark. Sup. Ct. R. 1-2(a)(2). We find no error and affirm.

The record reflects the following facts. On December 14, 1996, at approximately 9:45 p.m., Jerome Pfeifer and Anthony Seaborn were shot while sitting in Pfeifer's 1984 Cadillac at the intersection of Hope and Patrick Streets in Jonesboro. A 911 call from 1000 Hope Street at 9:45 p.m. alerted the police to the shootings. A second caller reported the shootings from 304 Patrick Street. The Jonesboro Police Department dispatched Officer Jim Milam, who arrived at the scene of the crime immediately after the first 911 call to find Pfeifer's empty car where it had run upon the curb.

Pfeifer, who had been in the driver's seat, was shot once in the left side of his nose, once in his right wrist, and six times in his back and left shoulder. Robert Hurd, a bystander who knew Pfeifer, drove Pfeifer along with Pfeifer's friend, Freddie Trice, to the hospital in Hurd's car. Pfeifer was pronounced dead on arrival at the hospital. The Arkansas State Crime Laboratory determined that the cause of Pfeifer's death was multiple gunshot wounds, and that at least one of the bullets was inflicted at close range.

The second 911 call was made from 304 Patrick Street where Seaborn had collapsed in the yard in an attempt to walk away. Seaborn, who had been in the passenger seat of Pfeifer's car, received two gunshot wounds in his left leg and hip area, and two wounds in his lower left back area before exiting Pfeifer's car.

Officer Milam found Seaborn and had him taken to St. Bernard's Hospital by ambulance. Seaborn died one week later. The State Crime Laboratory determined that the cause of Seaborn's death was also multiple gunshot wounds.

Appellant was arrested on December 16, 1996, two days after the shootings, and was subsequently charged with two counts of capital murder pursuant to Ark. Code Ann. § 5-10-101 (Supp. 1995). The trial began on June 19, 1997.

Lieutenant B.J. Smith, of the Jonesboro Police Department, testified that Appellant became a suspect based on statements he took at the scene from bystanders and neighborhood residents who had observed the shootings. Lieutenant Smith recovered two .9mm shell casings, one jacketed bullet, and a .9mm round from the immediate and surrounding area. Lieutenant Smith testified that he arrested Appellant as Appellant and his brother Derrick Scales drove into the driveway of the apartments where Scales lived. Smith further testified that at the time of his arrest, Appellant was dressed in a long, dark, almost black coat and tennis shoes. Smith also testified that there was $7,783 cash in Scales's car at the time of the arrest.

Robert Lewis testified that Pfeifer and Seaborn, "or whatever his name was," told him that they had robbed Appellant's girl-friend Sylvia "Michelle" Gates, taking all of Appellant's drugs and some money. Lewis testified that he had been standing on the driver's side of Pfeifer's car with Anthony Trice, but that he had gone across the street at the time of the shootings. Lewis further testified that after hearing gunshots, he heard Anthony Trice call Appellant's name. Lewis also stated that after the shootings, he saw smoke and saw Seaborn hit the ground. Lewis testified that he saw a guy in a ski mask running away from the scene toward McDaniel Street.

Anthony Trice, who was talking with Pfeifer and standing by the driver's side of Pfeifer's car at the time of the shooting, identi-fied Appellant as the shooter. Trice testified that he had known Appellant for about ten years and had seen Appellant earlier on the day of the shooting near Trice's aunt's house. Trice identified Appellant's Fila tennis shoes, which he saw Appellant wearing

both times he saw Appellant on December 14, 1996. Trice described Appellant as wearing a black ski mask with eyeholes at the time of the shooting. Trice testified that Appellant walked up to the car where the victims were. Trice stated that he had turned around, heard shots, and turned back around to see Appellant "up in the car." Trice testified that he said, "[W]hat are you doing, Eddie?", and that Appellant looked at him and left. Trice testified that he was "real close" to the victims at the time they were shot, and that he saw Appellant run toward McDaniel Street immediately after shooting Pfeifer. Trice testified that he later saw Appellant when Trice went to help Seaborn. Trice further testified that he saw Appellant driving a brown, "raggedy-looking" Cadillac as it turned from Creath Street to the north on Patrick Street. Trice stated that Appellant did not have on the mask as he drove away, and that Appellant's hair looked wild. Trice stated that he knew the shooter was Appellant, because he had known him for a long time and he knew "the way he walked, he talked, and everything." Trice stated that he also observed Appellant's eyes through the holes of the ski mask. Trice further identified Appellant's clothing as the same clothing he had worn earlier on the day of the shootings. Trice testified that Appellant's brother, Derrick Scales, had offered a number of times to pay him $4,000 to change his testimony.

Freddie Trice, Anthony's cousin, testified that Appellant and Pfeifer had a conversation in his and Lindsay McCullough's presence at about three o'clock on the afternoon of December 14, 1996. Trice further testified that Appellant approached Pfeifer on Creath Street and asked him how he could get "10 ounces." Trice testified that Appellant said he would pay for the purchase "right now" if Pfeifer could deliver immediately. When Pfeifer responded that he could deliver, Appellant asked Pfeifer if Pfeifer would be taking his "home boys" with him (to get the drugs), referring to Freddie Trice and McCullough. Trice testified that when Pfeifer said that he would, Appellant stated that Pfeifer could "forget about it," and then left. Trice further testified that he, Pfeifer, and McCullough left in Pfeifer's car to go to the convention center near Arkansas State University and to buy gasoline for the car. Trice stated that when the three men returned to the

neighborhood, they stopped to talk to Seaborn for awhile. Trice further stated that Seaborn later got into the car with Pfeifer, and that Trice left for his home on Creath Street to get his phone for McCullough and some food for Seaborn. Trice testified that when he returned with the food, Pfeifer and Seaborn had left in Pfeifer's car. Trice testified that he next heard gunshots, went back to his house, then ran back outside to help Pfeifer. Freddie Trice heard Anthony Trice "hollering." Freddie Trice testified that he held Pfeifer in his arms as Robert Hurd picked up the two men in his car and drove them to the hospital.

Nathaniel Anderson testified that on the day before the shootings, he and Appellant had a conversation at the corner of Fisher and Creath Street. Anderson testified that Appellant drove up in his blue Geo Metro, asking where "Mistro" was, referring to Pfeifer. Anderson further testified that he told Appellant he did not know, then Appellant told Anderson to tell Mistro "that I got him." When the State asked what that phrase implied to Anderson, Anderson indicated that it was a threat.

Janice Dollison testified that she had seen Appellant the day before the shootings occurred. Dollison further testified that she had heard Appellant threaten to kill someone at that time. Dollison testified that she saw Appellant on the night of December 14, 1996, at the corner of Hope and Baker Streets, approximately thirty minutes or an hour before the shootings. Dollison described Appellant as dressed in jeans and a jacket and identified the jacket he wore as similar to the black jacket shown to her by the prosecutor. Dollison stated that she later went down to the corner of Hope and Patrick Streets, where she saw Appellant wearing the same clothes as before and the ski mask. Dollison further stated that she had seen Pfeifer and Seaborn sitting inside the car and Appellant coming up Patrick Street towards Hope Street. She further testified that when Appellant got to Pfeifer's car, Appellant and Pfeifer exchanged words, then Appellant pulled a gun out of his pants. Dollison testified that after the shootings, Appellant put the gun back in his pants, went down the street toward McDaniel Street, and got into a car. Dollison further testified that both Derrick Scales and Appellant's uncle, Willie Tins-

ley, had threatened her to change her original statement, and that Scales had offered to pay her money to testify in Appellant's favor.

Kenny Ray Pickett testified that he was driving through the area on the night of December 14, 1996. Pickett further testified that he heard the gunshots and circled back around McDaniel Street. Pickett testified that he saw Appellant walking without the ski mask and getting into a vehicle. Pickett described Appellant as wearing dark clothing and identified Appellant's Fila shoes. Picket maintained that he knew Appellant and had no doubt that it was Appellant that he saw that night.

Appellant's defense was that he was at James Carter's house on the night of the shootings until about 10:00 p.m., before picking up Sylvia Gates at work. On cross-examination, Appellant maintained that Janice Dollison, Anthony Trice, Freddie Trice, Kenny Ray Pickett, and Nathaniel Anderson were all liars, but that he did not know why those persons would lie about him. Appellant further testified that he knew the police were looking for him after the shooting, and he sought advice from an attorney. Appellant admitted he had a conversation with Pfeifer about buying an "eight-ball" of "dope" from Pfeifer.

Sylvia Gates testified that on December 14, 1996, she worked from 2:00 p.m. until 10:00 p.m., and that Appellant drove her blue 1989 Geo Metro that day. On cross-examination, however, Gates admitted that she did not know of Appellant's whereabouts before he picked her up from work.

Appellant's brother Derrick Scales testified that he had helped Appellant's attorney investigate Appellant's case. Scales admitted that he had approached Dollison and Anthony Trice after reading their statements. Scales further admitted that he had sent Appellant over to Carter's to collect about $30 that Carter owed Scales, after hearing about the two shootings. When confronted with the cash that was in Scales's car at the time of Appellant's arrest, Scales responded that the money was to enable him to hire an attorney for Appellant.

Following the presentation of the evidence, the jury rendered a guilty verdict for capital murder of Pfeifer, a guilty verdict for

first-degree murder of Seaborn, and sentenced Appellant to life imprisonment without parole. The trial court entered its judgment on June 25, 1997. Appellant timely filed notice of this appeal on July 10, 1997. He raises four evidentiary errors for reversal.

We review evidentiary errors under the abuse-of-discretion standard. *Misskelley v. State*, 323 Ark. 449, 915 S.W.2d 702, *cert. denied*, 117 S. Ct. 246 (1996). The trial court has broad discretion in its evidentiary rulings; hence, the trial court's findings will not be disturbed on appeal unless there has been a manifest abuse of discretion. *Id.* The jury alone determines the credibility of the witnesses and apportions the weight to be given to the evidence. *Wilson v. State*, 332 Ark. 7, 962 S.W.2d 805 (1998). The jury also resolves any questions of conflicting testimony and inconsistent evidence. *Williams v. State*, 325 Ark. 432, 930 S.W.2d 297 (1996).

## I. Expert Testimony

Appellant first argues that the trial court erred when it refused to admit Dr. Marc Zimmerman's testimony. Dr. Zimmerman, a forensic psychologist, would have testified about the unreliability of eyewitness testimony. Appellant included a summary of Dr. Zimmerman's testimony in a motion in limine to the trial court. The trial court found that Dr. Zimmerman's testimony was a matter of common knowledge and would not assist the jury. The trial court asked Appellant's attorney what Dr. Zimmerman's testimony would accomplish that cross-examination of the eyewitnesses would not. Counsel for Appellant maintained that Dr. Zimmerman would testify about the effect of stress and expectations on eyewitnesses. The trial court found this argument unconvincing and specifically found that it would not be helpful, because the jury did not need an expert to testify about the obstacles of identifying a suspect wearing a ski mask.

On appeal, Appellant asserts that the expert testimony was necessary, because he claims that the State's case was based entirely on the eyewitness testimony of Anthony Trice and Janice Dollison. Appellant concedes, however, that the trial court has

discretion in the admissibility of expert-witness testimony, which will not be reversed absent an abuse of discretion. *Utley v. State*, 308 Ark. 622, 826 S.W.2d 268 (1992).

Arkansas Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact *to understand the evidence or to determine a fact in issue*, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. [Emphasis added.]

This court has emphasized that the balancing test of Rule 702 is separate from that of A.R.E. Rule 403, in which the trial court determines if the prejudicial value of the evidence substantially outweighs its probative value. *Prater v. State*, 307 Ark. 180, 820 S.W.2d 429 (1991). Under Rule 702, the trial court must determine whether the evidence is likely to confuse or mislead the jury. *Id.* The proponent of the evidence bears the burden of proof. *Id.*

A critical factor in determining the admissibility of expert testimony is whether the facts and circumstances of the case are beyond the jury's ability to comprehend and draw its own conclusions. *Utley*, 308 Ark. 622, 826 S.W.2d 268. In *Utley*, this court held that the trial court did not abuse its discretion by excluding testimony similar to Dr. Zimmerman's testimony regarding the unreliability of eyewitness testimony. The eyewitness in *Utley* testified that she looked at the appellant's face for a maximum of thirty seconds, due to her extreme fright. In affirming the trial court's decision not to admit the expert testimony, this court considered important that the defendant had cross-examined the witness; that the expert's testimony would not aid an average-intelligent juror; and that the prejudice would have far outweighed any probative value of the testimony. This court agreed that the expert testimony would not have been helpful to the jury and would have, in fact, usurped the jury's role as the trier of fact. This court also noted that the vast majority of jurisdictions had upheld decisions excluding this type of expert testimony. *See also Jones v. State*, 314 Ark. 289, 862 S.W.2d 242 (1993).

■ Appellant further argues that we should allow the admission of his expert's testimony as was done in *State v. Chapple*, 660 P.2d 1208 (Ariz. 1983) and *People v. McDonald*, 690 P.2d 709 (Cal. 1984). This court ultimately rejected similar arguments in *Utley*. We note that even in *McDonald*, the California appellate court discussed that testimony about the unreliability of eyewitnesses is within the trial court's realm of discretion. Appellant further argues in his reply brief that this court's rulings in *Utley* and *Jones* mandate that we reverse on this issue. Appellant also refers to this court's "blind adherence to precedent," essentially arguing our accepted rule that expert testimony is admissible if it is helpful to the trier of fact. As discussed above, this court has consistently rejected Appellant's out-of-state authority. We decline once more to adopt those cases.

■ Furthermore, we reject Appellant's argument that the State's case was based solely on Anthony Trice's and Janice Dollison's eyewitness accounts of the shootings. In addition to their eyewitness testimony of the shootings, Anthony Trice testified that he had known Appellant for about ten years, and that he recognized Appellant both with and without the mask. Kenny Ray Pickett testified that he knew Appellant and recognized him without the mask on McDaniel Street after hearing the gunshots. Appellant cross-examined all of these witnesses. Appellant also argued the credibility of the witnesses in closing argument. Accordingly, we conclude that the trial court did not abuse its discretion in excluding Dr. Zimmerman's expert testimony.

## II.  Ski-Mask Demonstration

Appellant's second argument is that the trial court erred when it refused to allow him to wear a ski mask in front of the jury. During Anthony Trice's cross-examination, Appellant attempted to introduce a rust-brown ski mask with holes for the eyes, nose, and mouth. The trial court sustained the State's objection to Appellant wearing the mask because it was not substantially similar to the one described by the eyewitnesses and would therefore mislead the jury. The trial court's ruling is supported by Anthony Trice and Janice Dollison describing the ski mask that Appellant wore as black with eyeholes only. Appellant specifically

contends that he was not able to cross-examine Trice about the size of the eyeholes in the mask, although he made no attempt to ask Trice about the size of the eyeholes or distinctive characteristics of Appellant's eyes without demonstrating the mask. Appellant now argues that the exclusion of the ski mask deprived him of the opportunity to effectively impeach the witness's credibility.

■ ■ Appellant mistakenly relies on *Bowden v. State*, 301 Ark. 303, 783 S.W.2d 842 (1990), in which this court recognized that there are limits to a defendant's right to cross-examine witnesses. This court held that the trial court should consider reasonable limitations such as harassment, prejudice, confusion of the issues, witness safety, repetition, and the relevance of the evidence. A substantial factor is whether the evidence is critical to the defense. *Id.* The trial court should not confuse effective cross-examination with "cross-examination that is effective in whatever way." *Id.* at 309, 783 S.W.2d at 844. This court's general rule is:

> When a test or experiment is an attempt to reenact the original happening, the essential elements of the experiment must be *substantially similar* to those existing at the time of the original occurrence.

*Bowden v. State*, 297 Ark. 160, 178, 761 S.W.2d 148, 157-58 (1988) (citations omitted) (emphasis added).

In *Garrison v. State*, 319 Ark. 617, 893 S.W.2d 763 (1995), this court upheld the State's demonstration of a knife that was dissimilar to the knife used in the crime. This court, however, considered that the State specifically informed the jury of the differences between the two knives and made no attempt to deceive the jury of the knife's origin. The State, in fact, informed the jury in great detail of how it purchased the knife used in the demonstration. This court concluded that based on those circumstances, there was no abuse of discretion. *See also Ferrell v. State*, 305 Ark. 511, 810 S.W.2d 29 (1991) (requiring an adequate foundation for demonstrations using physical evidence).

■ Here, the rust-brown ski mask that Appellant sought to use as demonstrative evidence was not remotely similar to the one described by Anthony Trice and Janice Dollison. Moreover, the demonstration was not critical to the defense, as the trial court

gave Appellant ample opportunity to cross-examine Anthony Trice without using the mask. Kenny Ray Pickett and Anthony Trice both identified Appellant without the mask immediately after the shootings. Anthony Trice further identified Appellant not only by his eyes but by his mannerisms, including the way he walked. Janice Dollison testified that she had seen Appellant earlier the same evening, wearing the identical clothes at the time of the shooting in addition to the mask.

■ The trier of fact may use all of the facts and circumstances to infer identification. *Womack v. State*, 301 Ark. 193, 783 S.W.2d 33 (1990). Appellant's argument that the trial court has less discretion in limiting cross-examination for impeachment purposes is not persuasive. *Klimas v. State*, 259 Ark. 301, 534 S.W.2d 202, *cert. denied*, 429 U.S. 846 (1976). The jury has the sole authority to evaluate the credibility of witnesses. *Wilson*, 332 Ark. 7, 962 S.W.2d 805.

■ We hold that the trial court properly sustained the State's objection that the ski-mask demonstration was prejudicial. We hold further that the trial court did not abuse its discretion in the trial court's exclusion of the ski mask.

## III.   *Attempted Drug Transaction*

For his third argument, Appellant argues that the trial court erred by failing to exclude Freddie Trice's testimony about the conversation between Appellant and Pfeifer about a potential drug transaction that transpired about six hours before the shootings. After conducting a hearing outside the presence of the jury, the trial court allowed the testimony, but cautioned Trice not to interpret or editorialize the conversation for the jury. Trice then recited the conversation in which Appellant approached Pfeifer about purchasing "10 ounces."

■ ■ The trial court has the discretion to determine whether prejudicial evidence substantially outweighs its probative value, and its judgment will be upheld absent a manifest abuse of discretion. *Weger v. State*, 315 Ark. 555, 869 S.W.2d 688 (1994). Evidence of other crimes is admissible under A.R.E. Rule 404(b) to prove motive, opportunity, intent, preparation, plan, knowl-

edge, identity, or lack of mistake or accident. In *Lee v. State*, 327 Ark. 692, 942 S.W.2d 231, *cert. denied*, 118 S. Ct. 572 (1997), we held that the trial court did not abuse its discretion by admitting a conversation about cocaine that the witness had with the appellant during a murder trial. This court explained:

> [W]hen the purpose of evidence is to·show motive, *anything and everything that might have influenced the commission of the act may, as a rule, be shown.* The State is entitled to produce evidence showing circumstances which explain the act, show a motive for killing, or illustrate the accused's state of mind.

*Id.* at 702, 942 S.W.2d at 235-36 (citations omitted) (emphasis added).

In *Johnson v. State*, 326 Ark. 430, 934 S.W.2d 179 (1996), *cert. denied*, 117 S. Ct. 1848 (1997), this court upheld the admission of conversations about a proposed drug transaction into evidence at the appellant's trial for murder. This court concluded that circumstances connecting the perpetrator to the victim and revealing a possible motive were clearly relevant. This court further elaborated that the circumstances of the attempted drug transaction did not justify excluding the conversation that was otherwise relevant.

Freddie Trice's testimony was highly relevant as to Appellant's probable motive or lack thereof. The jury might also have inferred Appellant's state of mind, intent, or plan from this testimony. Moreover, Appellant admitted that he had approached Pfeifer and inquired about buying an "eight-ball." Appellant even used Freddie Trice's testimony in his closing argument to suggest a lack of animosity between Appellant and Pfeifer. We therefore conclude that the trial court did not err by admitting Freddie Trice's testimony.

## *IV. Prior Threat*

For his final argument, Appellant argues that the trial court erred by failing to exclude Nathaniel Anderson's testimony of his conversation with Appellant on the day of the shootings, in which Appellant instructed Anderson to tell Pfeifer that "I got him." Appellant now attempts to argue on appeal that Anderson was

incompetent and that his testimony was irrelevant. This was not, however, the basis for his objection below. The exchange at trial took place as follows:

Mr. Walden:

. . . .

Q.  He told you to tell Mistro what?

A.  That he got him.

Q.  That he got him?

A.  Yeah.

Q.  And what does that, what did that imply to you?

Mr. Everett: Whoa, whoa, whoa, what that implied in meaning to this man is not admissible evidence, Judge. He can say what the man said, it's up to the jury to determine what that means.

Mr. Walden: Your Honor, now we sat through a day of Voir Dire about ebonics and this man is in that vernacular and he is talking to these people, and I think he's entitled to say if he considered that a threat, or if he did not consider that a threat. I think he's entitled to give his testimony on that.

Mr. Everett: I don't think so, not this man. What this man thought of that, those words is [sic] not proper at all.

Mr. Walden: I'll try to lay some foundation.

The Court: All right, go ahead and lay the foundation.

Mr. Walden:

Q.  When he said this to you, he said tell him I got him, is that an accepted terminology among you and your culture and your friends, does that have a particular meaning?

A.  Threat.

Q.  Pardon?

A.  It's a threat.

MR. EVERETT: I will object to that. The fact of what it means among his culture and his friends doesn't mean that that's what it means to Eddie Parker.

A.  Well, can I say something?

THE COURT: Overruled, overruled.

. . . .

MR. WALDEN:

Q.  Okay, let me go ahead. Now as I understand your testimony, you took that to be a threat?

A.  A threat.

Q.  And is that the way, in your opinion, is that how it was intended?

A.  Yes, sir.

This court has repeatedly held that parties on appeal are limited to their arguments made below. *Campbell v. State*, 319 Ark. 332, 891 S.W.2d 55 (1995). One cannot change the basis for his or her objection on appeal. *Id.* Despite the procedural defect in this argument, we would still affirm the trial court's ruling.

Arkansas Rule of Evidence 701 provides for lay-witness testimony:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are
> (1) Rationally based on the perception of the witness; and
> (2) Helpful to a clear understanding of his testimony or the determination of a fact in issue.

This court addressed similar lay testimony in *Nooner v. State*, 322 Ark. 87, 907 S.W.2d 677 (1995), *cert. denied*, 116 S. Ct. 1436 (1996), ultimately rejecting the appellant's argument that testimony by two of the witnesses did not satisfy the requirements of Rule 701. Nooner asserted that neither of the two witnesses were sufficiently familiar with him to make an identification from a video surveillance tape and photographs. This court held:

> Jazmar Kennedy had known Nooner for about three years and had seen him regularly. She had even lived in the same apart-

ment with him for a period of time. Martin testified that he had seen Nooner on five or six occasions and had seen him just a few hours before the murder. Both witnesses recognized the jacket and cap in the videotape and photographs and associated the clothing with Nooner. *These were special facts otherwise unknown to the jury.* The two witnesses then positively identified Nooner as the man with Scot Stobaugh. We hold that these witnesses had ample contact with Nooner to develop opinions based on their perceptions and that the trial court did not abuse its discretion in permitting them to relay their opinions to the jury.

We next turn to the argument of whether this testimony was *helpful* to the jury. We believe that it was. *The videotape and surveillance photographs are not crystal clear* for identification purposes but are somewhat blurred and indistinct. Hence, *any testimony from people who had a special familiarity with the suspect would qualify as an aid to the jury.*

*Id.* at 102-03, 907 S.W.2d at 685 (citations omitted) (emphasis added). This court concluded that the two witnesses reasonably formed their opinions based on their previous association with the appellant, and that they were familiar with the appellant's clothing and had sufficient time to observe him, giving them a special familiarity with the appellant.

Here, Anderson testified that he had a conversation with Appellant in person; thus, Anderson's testimony was rationally based on his perception. Anderson had a special familiarity with the Appellant and was familiar with the neighborhood terminology. The foundation for the testimony aided the jury in determining the colloquial phrase and to prove Appellant's motive. We conclude that Anderson's testimony was helpful to the jury. Moreover, the jury was free to disregard Anderson's testimony about what the phrase meant among the neighborhood residents. We also refute Appellant's assertion that there was no other evidence of motive throughout the entire case. Janice Dollison testified about Appellant's prior threats to kill someone. Freddie Trice testified about the aborted drug transaction. We thus hold that the trial court did not abuse its discretion when it allowed Anderson to testify about what the phrase, "I got him," meant. Accordingly, we affirm on this final issue.

## V. Rule 4-3(h)

We have reviewed the entire record for points of prejudicial error and conclude that there were no prejudicial errors or additional issues in this case. Accordingly, we affirm the trial court's judgment in its entirety.