777 So.2d 385 (2000)
Gary Lee THORP, Appellant,
v.
STATE of Florida, Appellee.
No. SC91663.
Supreme Court of Florida.
November 16, 2000.
Rehearing Denied January 31, 2001.
*387 James B. Gibson, Public Defender, and James R. Wulchak, Chief, Appellate Division, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Kenneth S. Nunnelley, Assistant Attorney General, Daytona Beach, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Gary Lee Thorp. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For reasons which follow, we reverse appellant's conviction for first-degree murder because we find harmful error in the admission of improper evidence at trial and remand for a new trial.

MATERIAL FACTS
Gary Thorp was convicted of first-degree murder[1] and sentenced to death for the murder of Sharon Chase. The record reflects that Chase's nude body was discovered in the bushes in Bean Park on June 24, 1993. Her body was lying face up, with her legs spread apart and knees partially bent. Her shirt had been pulled down to her waist, and her shorts were discovered some thirty feet away from the body. Semen discovered inside the victim's vagina matched Thorp's DNA profile. The medical examiner opined that death was caused by strangulation.[2] Thorp subsequently *388 was arrested for the murder of Sharon Chase in October of 1996.
Evidence presented at trial indicates that at approximately midnight on June 23, 1993, the victim and a white male were seen together crossing a bridge into Bean Park near U.S. 1 in Melbourne, Florida. The witness, Paul Symeon, was fishing in the marina across the street from the park and observed Chase and a man enter the park. Symeon described the man as "skinny or lanky," taller than the victim, with a dark complexion and dark, wavy hair. Symeon testified that the two "milled around for a while" and were then approached by another unidentified couple. After approximately ten minutes, Symeon heard rustling sounds in the bushes for a couple of minutes and then heard a sound similar to a moan. When he turned to look, he could not see what was causing the noises. However, Symeon noticed that no one was in the park at that time. At trial, Symeon identified Chase as the woman he had seen in the park. However, Thorp did not fit the physical description given by Symeon of the man he saw with Chase and Symeon could not identify Thorp as being present in the park the night of the crime.
Other evidence at trial revealed that Thorp and another man, William Deering, had been living at the Christ Is The Answer (CITA) Mission in Melbourne. On the night of the homicide, Thorp and Deering both missed the 11 p.m. bed check at the mission and, as a result, were not permitted to sleep there that night. David Gallamore, an employee at the mission, saw Thorp around 1:15 a.m. and noticed Thorp had been drinking and had blood on his shirt and bruises on his knuckles. Gallamore asked Thorp why he missed the earlier bed check. Thorp stated that he had been in a fight at a Burger King restaurant. He also asked Gallamore if Deering had been at the mission that night. In fact, Gallamore saw Deering at the mission at around 12:30 a.m.
Finally, the State presented Timothy Bullock, an inmate housed with Thorp at the Brevard County Jail during the spring of 1994 where Thorp was serving time for an unrelated crime. Bullock testified that Thorp told him that he and another man "took a hooker down by the bridge and did her," during which he got a lot of blood on himself. Bullock testified that Thorp admitted that he expected to be blamed for the Chase murder. In addition, and over defense counsel's objection, Bullock was allowed to testify that he interpreted Thorp's statement that he "did a hooker" to mean that Thorp killed her. Finally, Bullock testified that Thorp had admitted that, in order to be allowed into the mission with blood on his clothes that night, he had told the mission employee that the blood was caused by a fight at Burger King.
The defense did not present any witnesses during the guilt phase of the trial. After deliberation, the jury found Thorp guilty of first-degree murder. During the penalty phase, the State presented two witnesses, the prosecutor and the lead investigating officer in a 1994 murder case in which Thorp pled nolo contendere to a charge of second-degree murder for the fatal stabbing of Randy Appleman. The defense presented several witnesses of their own who testified that Thorp got along with others, was a hard worker, and assisted the mission director as his "right hand man" at the mission where he lived. Both of Thorp's parents testified that Thorp was born prematurely, suffered from cerebral palsy as a child, and ultimately developed a serious drinking problem. Thorp testified on his own behalf about his difficult early life, his cerebral palsy, his struggles with drugs and alcohol, and his checkered educational and employment history. During his testimony Thorp admitted to having consensual sexual intercourse with the victim but denied killing her. Thorp also denied killing Appleman, although he admitted to stealing Appleman's property and forging some of Appleman's checks. Thorp expressed remorse *389 for his past lifestyle but denied killing anyone. The jury recommended a sentence of death by a vote of ten to two, and the trial court followed this recommendation.[3]

APPEAL
On appeal, Thorp raises seven issues for this court's review.[4] We agree with Thorp that reversal is required on two of his claims: claim (1), concerning the trial court's failure to suppress evidence obtained from a substantially misleading affidavit for search warrant, and claim (3), concerning the trial court's error in allowing improper opinion testimony to go to the jury. Because we are reversing Thorp's conviction and sentence based on those asserted errors, we do not address claims (4), (5), (6), and (7) as they are now moot.

Sufficiency of the Evidence
Thorp argues the trial court erred in denying his motion for judgment of acquittal because the State's evidence failed to exclude the reasonable hypothesis of innocence that someone other than Thorp killed the victim. He contends that the DNA evidence proved only that he had sexual intercourse with the victim, not that he killed her. In addition, Thorp further contends that the evidence at trial contradicts the State's theory of how the murder occurred. Although we find prejudicial error with regard to two aspects of the State's case, we nevertheless find that the evidence was sufficient to overcome Thorp's motion for judgment of acquittal.
Because there were no eyewitnesses or other direct evidence of Thorp's commission of the murder, the State's case against Thorp was predicated chiefly upon circumstantial evidence. As we stated in State v. Law, 559 So.2d 187 (Fla.1989):
A special standard of review of the sufficiency of the evidence applies where a conviction is wholly based on circumstantial evidence. Jaramillo v. State, 417 So.2d 257 (Fla.1982). Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. McArthur v. State, 351 So.2d 972 (Fla.1977); Mayo v. State, 71 So.2d 899 (Fla.1954). The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse. Heiney v. State, 447 So.2d 210 (Fla.), cert. denied, 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984); Rose v. State, 425 So.2d 521 (Fla.1982), cert. denied, 461 U.S. 909, 103 S.Ct. 1883, 76 L.Ed.2d 812 (1983), disapproved on other grounds, Williams v. State, 488 So.2d 62 (Fla.1986). *390 Law, 559 So.2d at 188. On the basis of the above rule, we held in Law that where the State fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt, the court should grant a motion for judgment of acquittal. Id.

Thorp contends that the State's evidence fails to exclude the possibility that someone other than Thorp killed the victim since several people were seen in the park on the night of the murder and none of the witnesses could actually identify Thorp as the person they observed walking with the victim prior to the murder. He also points out there is no physical evidence that Thorp killed the victim.
The State's principle evidence linking Thorp to the crime includes the DNA evidence, Thorp's statements to his cellmate Bullock, and Thorp's physical appearance and condition on the night of the crime (i.e., that he was observed with blood on his clothing). We conclude that this evidence was sufficient to require this case to be submitted to the jury.
As noted above, the DNA evidence indicates that Thorp was with the victim and had sexual intercourse with her the night of the murder. We recognize that while the DNA evidence, like fingerprint evidence, does not conclusively prove that Thorp committed the murder, cf. Jaramillo v. State, 417 So.2d 257, 257 (Fla.1982) (disregarding fingerprint evidence where State failed to prove the defendant's fingerprints could only have been placed on items in victim's home at time murder was committed), the DNA evidence supports the State's contention that Thorp was with the victim in the park around the time she was killed.
The other significant evidence against Thorp is his supposed confession of the murder to cellmate Timothy Bullock. While Bullock testified that Thorp admitted he expected to be blamed for the murder of a prostitute, Bullock did not testify that Thorp ever directly admitted to killing the victim.[5] His actual statement, according to Bullock was that Thorp and another man "did a hooker."[6] However, direct evidence was also presented that Thorp was seen with injuries and blood on his clothes on the night of the crime, injuries that could be consistent with a physical struggle with the murder victim who had considerable bruises and abrasions on her body even if she did not bleed extensively. Obviously, the victim's assailant could also have been injured and bled.
On the face of the record before us, we find this evidence legally sufficient to convict Thorp of first-degree murder. While the State's evidence may not have been conclusive, it strongly suggests that Thorp struggled with and killed the victim. It was up to the jury to determine if this evidence proved Thorp's guilt beyond a reasonable doubt. Accordingly, we find no error in the trial court denying Thorp's motion for judgment of acquittal.

Motion to Suppress
On the other hand, we find the trial court committed prejudicial error by failing to exclude Thorp's blood samples and the resulting DNA evidence obtained from those samples. The record in this case reflects that approximately a year after the murder occurred, the police obtained a search warrant to take a blood sample from Thorp. The affidavit filed by the police stated that Thorp matched the description of the person Symeon observed walking with the victim on the night of the murder. The affidavit further provided the following facts: that Chase was a known prostitute who worked in the Melbourne *391 area; that on the night of the murder Symeon heard moaning (muffled screams) emanating from the park after the suspect and victim had entered it; that semen was discovered in the vaginal cavity of the victim in an amount sufficient to conduct a DNA comparison; that Thorp was the primary suspect in a unrelated stabbing incident in which the victim was also found nude; that Thorp frequented the Melbourne area near Bean Park and had lived at the CITA mission; that Thorp despised prostitutes; that Thorp and Deering had not spent the night at the mission on the night of the murder; that one of the them was observed with blood on his clothes; and that the suspect was observed wearing a ball cap and that Thorp consistently wore ball caps. Based on these facts, the magistrate judge issued a search warrant to obtain two vials of Thorp's blood for the purpose of conducting a DNA comparison with the semen recovered from the victim.
During pretrial proceedings, Thorp moved to suppress the physical evidence obtained as a result of the search warrant. At an evidentiary hearing on the matter, Thorp asserted the affidavit contained false statements and material omissions which, when considered in light of the remaining factual allegations, defeated a finding of probable cause. The State hesitantly conceded that the statement concluding that the suspect matched Thorp's description and the statements concerning the existence of a ball cap should be redacted. It maintained, however, that the remaining factual allegations in the affidavit were sufficient to establish probable cause. The trial court found that the affidavit falsely indicated that the description given by Symeon matched Deering and Thorp. However, the court concluded that the misstatement was not willful and, even if it was removed, the remaining content of the affidavit established probable cause. We disagree with the trial court's conclusion.
If an affidavit for search warrant contains intentional false statements or statements made with reckless disregard for the truth, the trial court must excise the false material and consider whether the affidavit's remaining content is sufficient to establish probable cause. See Franks v. Delaware, 438 U.S. 154, 156, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); Terry v. State, 668 So.2d 954, 958 (Fla.1996). This rule contains two components. First, the trial court must determine whether the affidavit contains an intentional false statement or a statement made in reckless disregard for the truth. Mere neglect or statements made by innocent mistake are insufficient. See Franks, 438 U.S. at 171, 98 S.Ct. 2674. Second, if the court finds the police acted deceptively, the court must excise the erroneous material and determine whether the remaining allegations in the affidavit support probable cause. See id. at 171-72, 98 S.Ct. 2674. If the remaining statements are sufficient to establish probable cause, the false statement will not invalidate the resulting search warrant. See Terry, 668 So.2d at 958. If, however, the false statement is necessary to establish probable cause, the search warrant must be voided and the evidence seized as a result of the search excluded. See id. (citing Franks, 438 U.S. at 156, 98 S.Ct. 2674).
Thorp points to several critical and substantial misstatements set out in the affidavit, the falsity of which were known to the police officer affiant. The first pertains to the identification of Thorp as the person last seen with the victim. The affidavit states that "the description of the male that was seen walking with the female (that is most probably Sharon Chase), prior to the murder, is consistent with the description of Thorpe and Deering." As noted above, the State conceded that the statement in the affidavit that Thorp and Deering matched the description given by Symeon should be stricken from the affidavit. The affidavit describes Thorp as a white male, approximately six feet tall, 220 pounds, with blue eyes and *392 bald/brown hair. Deering is a white male, approximately five feet, eight inches tall, 165 pounds, with brown eyes and brown hair. According to the statement Paul Symeon gave to the police shortly after the victim's body had been discovered, however, the person he observed with the victim was a white male, approximately six feet tall, seemingly thin, with medium to long dark brown hair, and a dark complexion. Symeon initially described the suspect as a minority and later, during a hypnotic session with the police, characterized the suspect as possibly Spanish. None of these known and obviously relevant facts about the suspect's complexion were included in the affidavit. Moreover, the officer who prepared the affidavit improperly likened Thorp to the person last seen with the victim. From the descriptions above, there appears to be little or no similarity between Thorp, Deering, and the person Symeon described as walking with the victim prior to the murder. Based on the patent differences in physical characteristics of the three persons involved and the crucial importance of this information in establishing probable cause, we find at least a patent and reckless disregard for the truth in this misstatement. See Franks.
In addition to the above, we find the affidavit patently misstates Symeon's description of the events in the park that night. The affidavit states that Symeon heard "moaning (muffled screams)" emanating from the park. The parenthetical was added not by the witness Symeon, but by the police, and obviously was intended to give meaning to the word "moaning." However, Symeon never described the sounds he heard as "muffled screams." In fact, in his initial statement to the police, Symeon stated that the sound he heard was "definitely not a scream and it was not a moan, it was something in between that." While under hypnosis, Symeon again described the noise he heard as a "moan" but made no reference to "muffled screams." He never saw what caused the moans. Thus, the affiant improperly inserted a misstatement as to what Symeon heard, and the affidavit's reference to "muffled screams" should also have been redacted.
Before considering the affidavit absent the misstated facts, we must also address other relevant facts known to the police, but which Thorp claims were improperly omitted from the affidavit. Thorp's contention is that had the omitted facts been included in the affidavit for search warrant, they would have defeated a finding of probable cause. Omissions made with intent to deceive or with reckless disregard must also be considered in considering a motion to suppress. See Johnson v. State, 660 So.2d 648, 656 (Fla. 1995). The only difference between omitted facts and misstated facts is that in the case of omitted facts, the reviewing court must first determine whether the omitted facts, if added to the affidavit, would have defeated probable cause. See id. The reviewing court must further find that the omission resulted from intentional or reckless police conduct that amounts to deception. See id.[7] "When a material fact is omitted from the affidavit filed in support of the probable cause determination, such fact constitutes a material omission if a substantial possibility exists that the omission would have altered a reasonable magistrate's probable cause determination." State v. Van Pieterson, 550 So.2d 1162, 1164 (Fla. 1st DCA 1989).
Here, several important and relevant facts were omitted which, when considered together with the other errors, appear to indicate a lack of probable cause. For example, the medical examiner had examined the victim's body shortly after it was *393 discovered and concluded that the victim had not bled profusely. Yet this fact was not included in the affidavit. This omitted material is important in light of the fact the affidavit states that Thorp was seen with blood on his clothes, giving the impression that he had been involved in a bloody struggle. Had the magistrate been told the victim did not shed blood, the evidence that Thorp had blood on his clothes might have carried less weight in the probable cause determination.
Other omissions concern Symeon and the actual description he provided to the police. For example, the affidavit does not reveal that Symeon was hypnotized and that several of his statements relied upon in the affidavit were the result of a hypnotic session.[8] One such statement induced during hypnosis concerns the fact that Symeon purportedly stated that the suspect was wearing a baseball cap. It is undisputed that Symeon never mentioned a baseball cap during his initial interview with the police. While under hypnosis, however, Symeon claimed that the man he saw with the victim was wearing a baseball cap. During that same session, he later reversed himself and stated that the suspect was not wearing a baseball cap or hat. The affidavit does not mention this patent inconsistency in Symeon's various statements to the police or the circumstances under which they were provided.[9] These omissions are material because the affidavit also claims that Thorp consistently wears baseball caps, a fact obviously intended to strengthen the connection to Thorp as the perpetrator, but which becomes irrelevant if the perpetrator was not wearing a cap on the night of the murder.[10]
We find that once the misstated facts are redacted and the omitted facts are included, the remaining factual allegations in the amended affidavit do not establish probable cause to believe that Thorp committed murder. Notably, despite the lengthy factual recitations in the affidavit, none of the truthful allegations identified Thorp as the person last seen with the victim or even placed Thorp in the park on the night of the homicide. At most, the affidavit indicates Thorp had been in an altercation that night and that he lived at the CITA mission. There is nothing within the affidavit's factual recitations to lead a magistrate to reasonably believe that Thorp was the person observed with the victim and was the person who caused the victim's death. Indeed, the affidavit also reveals that at least two other men were in the park that night, neither of whom was identified. On the strength of the amended affidavit, we cannot say the factual allegations therein are sufficient to establish probable cause to believe Thorp was involved in the instant murder.[11] Accordingly, we conclude the *394 trial court abused its discretion in denying Thorp's motion to suppress the blood samples and the DNA test results from those samples. See Jones v. State, 343 So.2d 921, 922 (Fla. 3d DCA 1977).
We must next determine whether the erroneous admission of the blood samples and resulting DNA analysis from those samples constitutes harmful error. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). Upon the record in this case, we find that it does. The State presented three experts in DNA analysis. The first expert conducted a Restriction Fragment Length Polymorphisms (RFLP) test on the semen found in the victim's vagina and compared the results to Thorp's and Deering's blood samples. After comparing the known samples, the expert was able to exclude Deering as the semen donor but indicated a possible match with Thorp's DNA profile. Dan Nippes, the second expert, performed a different DNA analysis on the samples, known as the Polymerase Chain Reaction (PCR) test, and concluded that the semen found in the victim matched Thorp's DNA profile. Nippes further opined that the chance of such a match occurring in the population is approximately one in one thousand Caucasians. The third expert testified that the statistical probability of finding a male unrelated to Thorp who matched both the RFLP DNA test result and the PCR DNA test result would be approximately one in 3.6 billion. During closing arguments, the State relied on this evidence in arguing that there is no reasonable doubt that the semen found in the victim belonged to Thorp.
The only other significant evidence of guilt included Thorp's statements to a fellow inmate and a witness's testimony that Thorp had blood on this clothes on the night of the murder. Based on the conclusive nature of the DNA evidence, however, and because it is the only physical evidence placing Thorp at the scene of the crime, we cannot say beyond a reasonable doubt that the improperly admitted DNA evidence had no effect on the verdict in this case. See DiGuilio, 491 So.2d at 1136; see also Goodwin v. State, 751 So.2d 537, 546 (Fla.1999) (reaffirming harmless error analysis in DiGuilio ). Thus, the court's error in failing to exclude the blood samples and DNA test results was harmful error, requiring reversal.

Admission of Opinion Testimony
We further find harmful error in the admission of improper opinion testimony by a lay witness. Thorp contends the trial court erred in permitting Bullock to testify as to what he thought Thorp meant when Thorp told him that he (Thorp) "did a hooker." The State, on the other hand, argues that Thorp failed to preserve this claim for appellate review and, even if preserved, the claim is meritless. We disagree with both of the State's contentions.
At trial, the following colloquy occurred between the State and Bullock:
[State] Q. Did you ever have any conversations with Gary Lee Thorp about the death of the prostitute under the bridge?
[Bullock] A. Yes, I did.
Q. Did he indicate to you that he knew about this incident?
A. Yes, he did.
Q. And did he indicate to you that he expected that he might be charged with this?
A. He told me he expected to be.
Q. What did he expect the charge to be?
A. Murder.
Q. What did he say about that incident?

*395 A. He told me that he knew the girl, that he had taken her down by the bridge and did her, that she was a hooker.
Q. Those were his words, that he did her?
A. Yes.
Q. What did you take that to mean?
A. That he had
[Defense counsel]: I object. That's not relevant. That's speculation. This gentlemen has not been qualified to interpret anything that he thought was said. It's just irrelevant and immaterial.
[The court]: Overruled.
Q. You may answer the question. What did you take that to mean?
A. I took that to mean that he was the one that killed her.
Q. Did he indicate to you whether or not there was any other person associated with this incident?
A. Yes, he did.
Q. How did he describe that to you?
A. I believe his words were, me and another guy took her down by the bridge and did her.
Contrary to the State's posture, we find that the claim was sufficiently preserved for review. Defense counsel objected to Bullock's testimony on the grounds that the opinion of the witness was not relevant, that it was immaterial, and that it called for speculation. Defense counsel further stated that the witness "has not been qualified to interpret anything that he thought was said." The objection sufficiently apprised the court of the issue, namely, whether the witness could provide an opinion or inference as to what he thought Thorp meant. Thus, Thorp preserved this issue for appellate review.
As for the merits of Thorp's contention, we find that the trial court erred in allowing Bullock to testify as to what he believed Thorp's statement to mean. As a general rule, lay witnesses may not testify in the form of opinions or inferences; it is the function of the jury to draw those inferences. Cf. Kersey v. State, 73 Fla. 832, 840, 74 So. 983, 986 (1917); see also Charles W. Ehrhardt, Florida Evidence § 701.1, at 538 (1999 ed.). An exception to this rule is found in section 90.701, Florida Statutes, which permits a lay witness to proffer testimony in the form of an inference and opinion where:
(1) The witness cannot readily, and with equal accuracy and adequacy, communicate what he or she has perceived to the trier of fact without testifying in terms of inferences or opinions and the witness's use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party; and
(2) The opinions and inferences do not require a special knowledge, skill, experience, or training.
§ 90.701, Fla. Stat. (1997); see also Kersey, 73 Fla. at 840, 74 So. at 986; Alexander v. State, 627 So.2d 35, 42 (Fla. 1st DCA 1993). Both prerequisites must be satisfied before a lay witness is allowed to testify in the form of an opinion or inference. See § 90.701; Ehrhardt, supra, at 540.
There is no claim in this case that Bullock's testimony required specialized skill or training. Accordingly, the second prong of section 90.701 is satisfied. However, it does not appear from the record that Bullock could not "readily, and with equal accuracy and adequacy, communicate what he ... has perceived to the trier of fact without testifying in terms of inferences or opinions." Bullock had no difficulty conveying to the jury what Thorp said to him while in prison. He testified that Thorp admitted that he "did a hooker" and that he expected to be charged with murder. The exact meaning of Thorp's words and the inferences that could be drawn from them, however, were matters for the jury to consider. Accordingly, any inferences that may have been drawn from Thorp's statement that he "did *396 a hooker" should have been made by the jury and not by the witness. See Kight v. State, 512 So.2d 922, 929 (Fla.1987) (holding that there is no need to resort to lay opinion testimony where witness adequately conveyed his perception of defendant's words and actions to jury), receded from on other grounds, Davis v. State, 698 So.2d 1182 (Fla.1997). Under these circumstances, there was no need to resort to testimony concerning Bullock's interpretation of Thorp's words. See id. Hence, the trial court erred in allowing this opinion testimony.
By permitting Bullock to interpret the meaning of Thorp's words, the trial court committed harmful error because it effectively turned Thorp's obvious admission of involvement in a crime into a confession of murder. As the record reflects, however, Thorp never confessed to murdering Sharon Case. Rather, during the penalty phase of the trial, he admitted only to having sexual intercourse with the victim, an act which is equally consistent with his admission to Bullock. Therefore, Bullock's opinion testimony that Thorp's statement that he "did a hooker" meant that he killed her, was undoubtedly prejudicial and we cannot say beyond a reasonable doubt that it did not affect the jury's verdict in this case. Under DiGuilio, the admission of Bullock's opinion testimony constitutes harmful error.

CONCLUSION
In sum, we find substantial error in the improper admission of certain highly prejudicial and damaging evidence against Thorp. We cannot find that error harmless under State v. DiGuilio, 491 So.2d 1129 (Fla.1986). Accordingly, we reverse Thorp's conviction for first-degree murder and vacate his sentence of death. This case is remanded to the trial court with directions that a new trial be promptly conducted. Because we are remanding for a new trial, we need not address Thorp's remaining issues on appeal.
It is so ordered.
SHAW, ANSTEAD, PARIENTE and LEWIS, JJ., concur.
WELLS, C.J., dissents with an opinion.
QUINCE, J., dissents with an opinion, in which HARDING, J., concurs.
WELLS, C.J., dissenting.
I dissent from the majority's reversal of Thorp's first-degree murder conviction and remand for a new trial because the evidence the majority suppresses would have lawfully been procured from either an independent source or through inevitable discovery doctrines. Upon remand, the evidence suppressed today will lawfully be secured by the State and again used against Thorp in his new trial. Thus, I conclude that the search conducted pursuant to the warrant obtained with a defective affidavit is harmless error and its fruits cannot be excluded. I also dissent from the majority's conclusion that the admission of opinion testimony by a lay witness was improper and constituted harmful error. The opinion testimony was properly admitted.

Motion to Suppress
The issue of whether the Fourth Amendment has been violated by police conduct is distinct from whether the exclusionary rule is appropriately imposed. See Illinois v. Gates, 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The Fourth Amendment itself does not preclude the use of illegally seized evidence. See United States v. Leon, 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In fact, the use of fruits tainted by an unlawful search and seizure "work[s] no new Fourth Amendment wrong." United States v. Calandra, 414 U.S. 338, 354, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). The exclusionary rule is simply a judicial remedy created to protect Fourth Amendment rights through deterrence of unlawful searches and seizures. See Leon, 468 U.S. at 906, 104 S.Ct. 3405. When determining whether the exclusionary rule should be *397 applied, a court must weigh the benefits of the rule's deterrence of police misconduct against the costs of precluding trustworthy tangible evidence in the prosecution's case-in-chief. Id. In resolving this issue, the Supreme Court held in Leon that the exclusionary rule will not bar evidence the police obtained in reasonable reliance on a search warrant later found invalid on appeal. See Leon, 468 U.S. at 925-26, 104 S.Ct. 3430. Accordingly, the exclusionary rule cannot be imposed upon evidence obtained through the unlawful conduct of the police that ultimately would lawfully and independently have been discovered or obtained through an independent source. See Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); see also Maulden v. State, 617 So.2d 298 (Fla.1993); Craig v. State, 510 So.2d 857 (Fla.1987). In Nix, the Supreme Court determined that the proper balance between society's interest in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime would be to place police in the same position they would have been in absent the police misconduct. See Nix, 467 U.S. at 443-44, 104 S.Ct. 2501. Forever excluding illegally obtained evidence would be a drastic and socially costly course of action. Id.
The facts here indicate that despite the police misconduct, the police would have procured factual allegations sufficient to establish probable cause to issue the warrant through ordinary and routine investigative procedures. The State presented Timothy Bullock, an inmate housed with Thorp at the Brevard County Jail during the spring of 1994. At that time, Thorp was being held for another unrelated homicide. Bullock testified that Thorp told him that he got a lot of blood on himself when he and another man took "a hooker" down by a bridge and "did her." Bullock also testified that Thorp admitted that he expected to be blamed for the murder of Chase. Id. Such information, in combination with the allegation that Thorp was seen with blood on himself at the CITA mission on the very night of Chase's murder, minutes away from where her body was found, constitutes sufficient probable cause to secure a search warrant.
Moreover, upon remand, there is clearly a basis to obtain a valid search warrant, secure Thorp's blood samples, and obtain the same DNA analysis that was used in the first trial. I believe the Court does not have to ignore the fact that the DNA is what it is and does not change.
Furthermore, for the sake of maintaining prison security or inmate health and safety, Thorp was and is subject to warrantless searches and seizures. See Bell v. Wolfish, 441 U.S. 520, 559-60, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (on the assumption that pretrial detainees have a diminished expectation of privacy, warrantless body cavity searches are not unreasonable under the Fourth Amendment when balanced against the interest of maintaining prison security); Brown v. State, 493 So.2d 80 (Fla. 1st DCA 1986) (inmates retain a diminished expectation of privacy such that warrantless searches and seizures of an inmate's hair, blood, or fingerprints are not unreasonable where the inmate has been implicated in the commission of a crime). Therefore, independent of the defective affidavit, the police could and can legally secure inmate Thorp's blood samples. See Silverthorne, 251 U.S. at 392, 40 S.Ct. 182.
DNA is a modern advance in identification in criminal cases to which a lesser standard of probable cause should be adopted than is used by the majority. Testing for DNA is in modern reality no more invasive of privacy than getting a person's name or fingerprints. The use of Thorp's name or fingerprints as evidence would not be excluded. Thorp's blood samples should not be excluded either. To the contrary, the use of DNA should be encouraged by our law as a tool serving the ends of justice as to both the not guilty *398 and the guilty. However, to remand for a new trial is legally and practically unsound.

Admission of Opinion Testimony
I conclude that the trial court did not err in allowing Bullock to testify as to the meaning of Thorp's statement. A jury bears the responsibility of drawing inferences from facts that are within the ordinary experience of jurors. See McGough v. State, 302 So.2d 751, 755 (Fla.1974). Therefore, generally, a lay witness may not testify in the form of opinion. See Floyd v. State, 569 So.2d 1225, 1232 (1990). Section 90.701, Florida Statutes (1997), permits a lay witness to testify in the form of opinion and inference where the
witness cannot readily, and with equal accuracy and adequacy, communicate what he or she has perceived to the trier of fact without testifying in terms of inferences or opinions and the witness's use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party.
§ 90.701, Fla. Stat.; see also Kersey v. State, 73 Fla. 832, 74 So. 983, 986 (1917). "Lay witness opinion testimony is admissible if it is within the ken of an intelligent person with a degree of experience." Floyd, 569 So.2d at 1232.
The majority's reliance on Kight v. State to find Bullock's opinion testimony inadmissible is misplaced. 512 So.2d 922 (Fla. 1987), receded from on other grounds, Davis v. State, 698 So.2d 1182 (Fla.1997). In Kight, we excluded testimony that elaborated on whether the codefendant encouraged the murder of the victim by the gesture of pressing his hand over the hand of the defendant who was pressing the knife against the victim's throat. See Kight, 512 So.2d at 929. In Kight the gesture obviously encouraged the killing of the victim; thus, the interpretation of the gesture improperly invaded the province of the jury. Id. Here, the phrase "I did her" is slang not of ordinary usage, foreign to the understanding of the average juror. Bullock could not testify fully, nor could the jury understand adequately and accurately Bullock's perception without his testimony ascribing meaning to this slang phrase. Indeed, it was because Bullock testified as to the slang phrase's meaning that the jury was not misled. Moreover, Bullock, unlike the average juror, is a lay witness whose range of experience as an inmate has ordinarily exposed him to such slang, thus qualifying him to ascribe meaning for the jury. See Floyd, 569 So.2d at 1232. Appropriately left to the jury was the determination of the credence and weight to be given the witness. See Jones v. State, 440 So.2d 570, 574 (Fla.1983). As in other jurisdictions, clearly the law of Florida should permit participants in conversations to explain their understanding of the meaning of the words used in the conversations. See United States v. Delpit, 94 F.3d 1134, 1145 (8th Cir.1996) ("There is no more reason to expect unassisted jurors to understand drug dealer's cryptic slang than antitrust theory or asbestosis."); United States v. Flores, 63 F.3d 1342, 1359 (5th Cir.1995) (witness's testimony on meaning of code phrases was essential to jury's understanding); United States v. Awan, 966 F.2d 1415 (11th Cir. 1992) (witness who was a police officer familiar with finance and money laundering could properly explain terms used in the conversation to the jury); Parker v. State, 333 Ark. 137, 968 S.W.2d 592, 599-600 (1998) (witness who was familiar with terminology around neighborhood could properly testify to meaning of colloquial phrase "I got him," as it aided jury, which was free to disregard the witness's opinion testimony); State v. Johnson, 309 N.J.Super. 237, 706 A.2d 1160, 1172 (1998) (witness who was former prisoner and had knowledge of street terminology properly assisted jury in explaining slang phrase "get paid," that was unfamiliar to average juror); Johnson v. State, 975 S.W.2d 644, 654 (Tex.App.1998) (witness who was police *399 officer could interpret slang for jury).[12] Here, the trial court properly admitted the opinion testimony.
Accordingly, I would affirm the conviction of first-degree murder.
QUINCE, J., dissenting.
While I agree with the majority that the admission of the jailhouse informant's testimony interpreting the meaning of the term "did her" was error, this case also raises the question of whether there is sufficient evidence on which to base a conviction for first-degree murder. At best the evidence presented only demonstrates that Thorp, at some point on the night of the murder, had sex with the victim since the semen found in her vagina matched Thorp's DNA.
In addition to the DNA evidence, the State presented a witness who saw the victim crossing a bridge in Bean Park during the late hours on the night of her death. The witness gave a description of the male he saw with her. That description did not fit Thorp, and the witness could not identify Thorp as the person he saw that night. The jailhouse informant testified that Thorp admitted to being with a "hooker" down by the bridge. Thorp allegedly also admitted he got blood on his clothing at that time but told the mission personnel that he was in a fight at Burger King. The State also presented evidence that there was some blood on Thorp's clothing; however, the medical examiner testified that there was no external bleeding by the victim which would have stained someone's clothing.
This evidence and the reasonable inferences to be drawn from it are simply insufficient to demonstrate premeditated or felony murder beyond a reasonable doubt. I would reverse this conviction based on insufficient evidence.
HARDING, J., concurs.
NOTES
[1] The court instructed the jury on both first-degree felony murder and first-degree premeditated murder. The jury returned a general verdict of guilt.
[2] The medical examiner testified that Chase died from asphyxiated strangulation due to fractures in the victim's neck cartilage. The medical examiner also testified that absent evidence of strangulation, death could have resulted from the extensive cocaine present in the victim's blood or from narrowing of the victim's coronary artery. Several other injuries were observed, including bruising and abrasions to the face, right arm, upper back, and legs. However, the medical examiner testified that there was no external bleeding by the victim such as would stain the clothing of someone who came in contact with her. While a small amount of menstrual blood was discovered inside the victim's uterine cavity, indicating the end of her menstrual cycle, there were no injuries to her genitalia, although there was some plant material in the victim's trachea and vagina. The medical examiner testified that the victim probably sucked the plant material into her trachea as she attempted to inhale while being strangled. She also had numerous ant bites on her body.
[3] In imposing death, the trial court found three aggravating factors: (1) the defendant was previously convicted of a felony involving the use or threat of violence (i.e., second-degree murder committed after the offense in the instant case); (2) the murder was committed during the course of a felony (i.e., sexual battery); and (3) the murder was heinous, atrocious or cruel. The trial court did not find any statutory mitigators, but found the following two nonstatutory mitigators: (1) Thorp's disadvantaged and painful childhood caused by his premature birth and pain associated with cerebral palsy ("some weight") and (2) Thorp's family background, including his problems with drugs and alcohol ("some weight").
[4] These issues include: (1) whether the trial court erred in denying Thorp's motion to suppress Thorp's blood sample on the ground that it had been obtained on the basis of a false affidavit; (2) whether the evidence is sufficient to support a conviction for first-degree murder; (3) whether the trial court erred in admitting opinion testimony from a lay witness; (4) whether the trial court precluded impeachment of the State's key expert witness; (5) whether the trial court erred in admitting testimony of DNA evidence; (6) whether the trial court improperly excused a potential juror; and (7) whether the trial court improperly considered aggravating factors and failed to consider mitigation evidence.
[5] Thorp challenges the admission of a portion of Bullock's testimony. That issue will be addressed in further detail later in this opinion.
[6] It is not clear from the record who this "other man" was. We presume that Thorp was referring to Deering. However, Deering was not called as a witness and his involvement is not further explained by the record.
[7] As we did in Johnson, we recognize that a significant number of facts are collected during police investigations and that police may often intentionally exclude facts which they in good faith believe to be marginal, extraneous or cumulative. Id. Therefore, only material omissions should be considered in assessing the magistrate's probable cause determination.
[8] In Florida, statements elicited during and after hypnosis are considered unreliable and may not be admitted into evidence at a criminal trial. See Stokes v. State, 548 So.2d 188, 195-96 (Fla.1989); Bundy v. State, 471 So.2d 9, 18 (Fla.1985).
[9] At the suppression hearing, the State conceded that the court should redact the portion of the affidavit relating to the ball cap.
[10] Thorp also claims that the affidavit omitted the fact that Symeon had seen a photograph of Thorp but could not identify him as the man he saw walking with the victim in the park on the night of the murder. However, this fact came out during Symeon's deposition in January 1997, several years after the affidavit for search warrant was filed, when he admitted to seeing Thorp's picture in the newspaper. It is not known from the record whether the police were aware of the fact that Symeon had seen Thorp's photo and did not recognize him. According to Symeon, he was never shown a photographic lineup. Thus, we find no error with regard to this issue because Thorp failed to establish that at the time the affidavit was filed the police knew Symeon had seen a picture of Thorp and could not identify him.
[11] Contrary to the State's posture, the good faith exception to an invalid search warrant does not apply in this case because the search warrant was based on a misleading or false affidavit. See United States v. Leon, 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) ("Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth."); see also Van Pieterson, 550 So.2d at 1165 (holding "good faith" exception does not apply where police officer omitted relevant facts that would have defeated probable cause).
[12] The federal cases were decided under Federal Rule of Evidence 701, which states:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.
The state cases cited were decided under a lay witness statute identical to the Federal Rule of Evidence 701. I do recognize that the language of section 90.701 varies from the language of the lay opinion testimony statutes that were used to decide the cases cited above. However, I do not read the different language of section 90.701 to render inadmissible a lay witness' interpretation of terms unfamiliar to the average juror.